# LALLI v. LALLI, ADMINISTRATRIX, ET AL.

No. 77–1115.  Argued October 4, 1978—Decided December 11, 1978

POWELL, J., announced the judgment of the Court and delivered an opinion, in which BURGER, C. J., and STEWART, J., joined. STEWART, J., filed a concurring opinion, *post*, p. 276. BLACKMUN, J., filed an opinion concurring in the judgment, *post*, p. 276. REHNQUIST, J., filed a statement concurring in the judgment, *post*, p. 276. BRENNAN, J., filed a dissenting opinion, in which WHITE, MARSHALL, and STEVENS, JJ., joined, *post*, p. 277.

*Leonard M. Henkin* argued the cause for appellant. With him on the brief was *Morris R. Henkin.*

*Irwin M. Strum,* Assistant Attorney General of New York, argued the cause for appellee Lefkowitz. With him on the brief were *Louis J. Lefkowitz,* Attorney General, *pro se, Samuel A. Hirshowitz,* First Assistant Attorney General, and *Neil S. Solon* and *Suzanne McGrattan,* Assistant Attorneys General.*

---

*\*John E. Kirklin, Kalman Finkel,* and *Jane Greengold Stevens* filed a

MR. JUSTICE POWELL announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE and MR. JUSTICE STEWART join.

This case presents a challenge to the constitutionality of § 4–1.2 of New York's Estates, Powers, and Trusts Law,[1] which requires illegitimate children who would inherit from their fathers by intestate succession to provide a particular form of proof of paternity. Legitimate children are not subject to the same requirement.

I

Appellant Robert Lalli claims to be the illegitimate son of Mario Lalli who died intestate on January 7, 1973, in the State of New York. Appellant's mother, who died in 1968, never was married to Mario. After Mario's widow, Rosamond Lalli, was appointed administratrix of her husband's estate, appellant petitioned the Surrogate's Court for Westchester County for a compulsory accounting, claiming that he and his sister Maureen Lalli were entitled to inherit from Mario as his children. Rosamond Lalli opposed the petition. She argued that even if Robert and Maureen were Mario's children, they were not lawful distributees of the estate because they had failed to comply with § 4–1.2,[2] which provides in part:

"An illegitimate child is the legitimate child of his

---

brief for the Legal Aid Society of New York City et al. as *amici curiae* urging reversal.

[1] 1965 N. Y. Laws, ch. 958, § 1. The statute was initially codified as N. Y. Decedent Est. Law § 83–a. In 1966 it was recodified without material change as N. Y. Est., Powers & Trusts Law § 4–1.2 (McKinney 1967). 1966 N. Y. Laws, ch. 952. Further nonsubstantive amendments were made the next year. 1967 N. Y. Laws, ch. 686, §§ 28, 29.

[2] Section 4–1.2 in its entirety provides:

"(a) For the purposes of this article:

"(1) An illegitimate child is the legitimate child of his mother so that he and his issue inherit from his mother and from his maternal kindred.

"(2) An illegitimate child is the legitimate child of his father so that

father so that he and his issue inherit from his father if a court of competent jurisdiction has, during the lifetime of the father, made an order of filiation declaring paternity in a proceeding instituted during the pregnancy of the mother or within two years from the birth of the child."

Appellant conceded that he had not obtained an order of filiation during his putative father's lifetime. He contended, however, that § 4–1.2, by imposing this requirement, discriminated against him on the basis of his illegitimate birth in violation of the Equal Protection Clause of the Fourteenth Amendment.[3] Appellant tendered certain evidence of his relationship with Mario Lalli, including a notarized document

he and his issue inherit from his father if a court of competent jurisdiction has, during the lifetime of the father, made an order of filiation declaring paternity in a proceeding instituted during the pregnancy of the mother or within two years from the birth of the child.

"(3) The existence of an agreement obligating the father to support the illegitimate child does not qualify such child or his issue to inherit from the father in the absence of an order of filiation made as prescribed by subparagraph (2).

"(4) A motion for relief from an order of filiation may be made only by the father, and such motion must be made within one year from the entry of such order.

"(b) If an illegitimate child dies, his surviving spouse, issue, mother, maternal kindred and father inherit and are entitled to letters of administration as if the decedent were legitimate, provided that the father may inherit or obtain such letters only if an order of filiation has been made in accordance with the provisions of subparagraph (2)." N. Y. Est., Powers & Trusts Law § 4–1.2 (McKinney 1967).

[3] Appellant also claimed that § 4–1.2 was invalid under N. Y. Const., Art. 1, § 11. The New York Court of Appeals did not rule on this issue, nor do we. We also do not consider whether § 4–1.2 unconstitutionally discriminates on the basis of sex or whether the administratrix of Mario's estate is required to account for her alleged failure to bring a wrongful-death action on behalf of appellant. The latter question was not considered by the Court of Appeals, and the former was raised for the first time by a brief *amici curiae* in this Court.

in which Lalli, in consenting to appellant's marriage, referred to him as "my son," and several affidavits by persons who stated that Lalli had acknowledged openly and often that Robert and Maureen were his children.

The Surrogate's Court noted that § 4–1.2 had previously, and unsuccessfully, been attacked under the Equal Protection Clause. After reviewing recent decisions of this Court concerning discrimination against illegitimate children, particularly *Labine* v. *Vincent,* 401 U. S. 532 (1971), and three New York decisions affirming the constitutionality of the statute, *In re Belton,* 70 Misc. 2d 814, 335 N. Y. S. 2d 177 (Surr. Ct. 1972); *In re Hendrix,* 68 Misc. 2d 439, 444, 326 N. Y. S. 2d 646, 652 (Surr. Ct. 1971); *In re Crawford,* 64 Misc. 2d 758, 762–763, 315 N. Y. S. 2d 890, 895 (Surr. Ct. 1970), the court ruled that appellant was properly excluded as a distributee of Lalli's estate and therefore lacked status to petition for a compulsory accounting.

On direct appeal the New York Court of Appeals affirmed. *In re Lalli,* 38 N. Y. 2d 77, 340 N. E. 2d 721 (1975). It understood *Labine* to require the State to show no more than that "there is a rational basis for the means chosen by the Legislature for the accomplishment of a permissible State objective." 38 N. Y. 2d, at 81, 340 N. E. 2d, at 723. After discussing the problems of proof peculiar to establishing paternity, as opposed to maternity, the court concluded that the State was constitutionally entitled to require a judicial decree during the father's lifetime as the exclusive form of proof of paternity.

Appellant appealed the Court of Appeals' decision to this Court. While that case was pending here, we decided *Trimble* v. *Gordon,* 430 U. S. 762 (1977). Because the issues in these two cases were similar in some respects, we vacated and remanded to permit further consideration in light of *Trimble. Lalli* v. *Lalli,* 431 U. S. 911 (1977).

On remand,[4] the New York Court of Appeals, with two judges dissenting, adhered to its former disposition. *In re Lalli,* 43 N. Y. 2d 65, 371 N. E. 2d 481 (1977). It acknowledged that *Trimble* contemplated a standard of judicial review demanding more than "a mere finding of some remote rational relationship between the statute and a legitimate State purpose," 43 N. Y. 2d, at 67, 371 N. E. 2d, at 482, though less than strictest scrutiny. Finding § 4–1.2 to be "significantly and determinatively different" from the statute overturned in *Trimble,* the court ruled that the New York law was sufficiently related to the State's interest in " 'the orderly settlement of estates and the dependability of titles to property passing under intestacy laws,' " 43 N. Y. 2d, at 67, 69–70, 371 N. E. 2d, at 482–483, quoting *Trimble, supra,* at 771, to meet the requirements of equal protection.

Appellant again sought review here, and we noted probable jurisdiction. 435 U. S. 921 (1978). We now affirm.

## II

We begin our analysis with *Trimble.* At issue in that case was the constitutionality of an Illinois statute providing that a child born out of wedlock could inherit from his intestate father only if the father had "acknowledged" the child and the child had been legitimated by the intermarriage of the parents. The appellant in *Trimble* was a child born out of wedlock whose father had neither acknowledged her nor married her mother. He had, however, been found to be her father in a judicial decree ordering him to contribute to her support. When the father died intestate, the child was excluded as a distributee because the statutory requirements for inheritance had not been met.

We concluded that the Illinois statute discriminated against

---

[4] On remand from this Court, the New York Attorney General was permitted to intervene as a defendant-appellee. He has filed a brief on the merits and argued the case in this Court. Appellee Rosamond Lalli did not present oral argument and has not filed a brief on the merits.

illegitimate children in a manner prohibited by the Equal Protection Clause. Although, as decided in *Mathews* v. *Lucas*, 427 U. S. 495, 506 (1976), and reaffirmed in *Trimble, supra*, at 767, classifications based on illegitimacy are not subject to "strict scrutiny," they nevertheless are invalid under the Fourteenth Amendment if they are not substantially related to permissible state interests. Upon examination, we found that the Illinois law failed that test.

Two state interests were proposed which the statute was said to foster: the encouragement of legitimate family relationships and the maintenance of an accurate and efficient method of disposing of an intestate decedent's property. Granting that the State was appropriately concerned with the integrity of the family unit, we viewed the statute as bearing "only the most attenuated relationship to the asserted goal." *Trimble, supra*, at 768. We again rejected the argument that "persons will shun illicit relations because the offspring may not one day reap the benefits" that would accrue to them were they legitimate. *Weber* v. *Aetna Casualty & Surety Co.*, 406 U. S. 164, 173 (1972). The statute therefore was not defensible as an incentive to enter legitimate family relationships.

Illinois' interest in safeguarding the orderly disposition of property at death was more relevant to the statutory classification. We recognized that devising "an appropriate legal framework" in the furtherance of that interest "is a matter particularly within the competence of the individual States." *Trimble, supra*, at 771. An important aspect of that framework is a response to the often difficult problem of proving the paternity of illegitimate children and the related danger of spurious claims against intestate estates. See *infra*, at 270–271. These difficulties, we said, "might justify a more demanding standard for illegitimate children claiming under their fathers' estates than that required either for illegitimate children claiming under their mothers' estates or for legitimate children generally." *Trimble, supra*, at 770.

The Illinois statute, however, was constitutionally flawed because, by insisting upon not only an acknowledgment by the father, but also the marriage of the parents, it excluded "at least some significant categories of illegitimate children of intestate men [whose] inheritance rights can be recognized without jeopardizing the orderly settlement of estates or the dependability of titles to property passing under intestacy laws." *Id.*, at 771. We concluded that the Equal Protection Clause required that a statute placing exceptional burdens on illegitimate children in the furtherance of proper state objectives must be more " 'carefully tuned to alternative considerations,' " *id.*, at 772, quoting *Mathews* v. *Lucas, supra*, at 513, than was true of the broad disqualification in the Illinois law.

## III

The New York statute, enacted in 1965, was intended to soften the rigors of previous law which permitted illegitimate children to inherit only from their mothers. See *infra*, at 269. By lifting the absolute bar to paternal inheritance, § 4–1.2 tended to achieve its desired effect. As in *Trimble*, however, the question before us is whether the remaining statutory obstacles to inheritance by illegitimate children can be squared with the Equal Protection Clause.

## A

At the outset we observe that § 4–1.2 is different in important respects from the statutory provision overturned in *Trimble*. The Illinois statute required, in addition to the father's acknowledgment of paternity, the legitimation of the child through the intermarriage of the parents as an absolute precondition to inheritance. This combination of requirements eliminated "the possibility of a middle ground between the extremes of complete exclusion and case-by-case determination of paternity." *Trimble*, 430 U. S., at 770–771. As

illustrated by the facts in *Trimble,* even a judicial declaration of paternity was insufficient to permit inheritance.

Under § 4-1.2, by contrast, the marital status of the parents is irrelevant. The single requirement at issue here is an evidentiary one—that the paternity of the father be declared in a judicial proceeding sometime before his death.[5] The child need not have been legitimated in order to inherit from his father. Had the appellant in *Trimble* been governed by § 4-1.2, she would have been a distributee of her father's estate. See *In re Lalli,* 43 N. Y. 2d, at 68 n. 2, 371 N. E. 2d, at 482 n. 2.

A related difference between the two provisions pertains to the state interests said to be served by them. The Illinois law was defended, in part, as a means of encouraging legitimate family relationships. No such justification has been offered in support of § 4-1.2. The Court of Appeals disclaimed that the purpose of the statute, "even in small part,

---

[5] Section 4-1.2 requires not only that the order of filiation be made during the lifetime of the father, but that the proceeding in which it is sought be commenced "during the pregnancy of the mother or within two years from the birth of the child." The New York Court of Appeals declined to rule on the constitutionality of the two-year limitation in both of its opinions in this case because appellant concededly had never commenced a paternity proceeding at all. Thus, if the rule that paternity be judicially declared during his father's lifetime were upheld, appellant would lose for failure to comply with that requirement alone. If, on the other hand, appellant prevailed in his argument that his inheritance could not be conditioned on the existence of an order of filiation, the two-year limitation would become irrelevant since the paternity proceeding itself would be unnecessary. See *In re Lalli,* 43 N. Y. 2d 65, 68 n. 1, 371 N. E. 2d 481, 482 n. 1 (1977); *In re Lalli,* 38 N. Y. 2d 77, 80 n., 340 N. E. 2d 721, 723 n. (1975). As the New York Court of Appeals has not passed upon the constitutionality of the two-year limitation, that question is not before us. Our decision today therefore sustains § 4-1.2 under the Equal Protection Clause only with respect to its requirement that a judicial order of filiation be issued during the lifetime of the father of an illegitimate child.

was to discourage illegitimacy, to mold human conduct or to set societal norms." *In re Lalli, supra,* at 70, 371 N. E. 2d, at 483. The absence in § 4–1.2 of any requirement that the parents intermarry or otherwise legitimate a child born out of wedlock and our review of the legislative history of the statute, *infra,* at 269–271, confirm this view.

Our inquiry, therefore, is focused narrowly. We are asked to decide whether the discrete procedural demands that § 4–1.2 places on illegitimate children bear an evident and substantial relation to the particular state interests this statute is designed to serve.

## B

The primary state goal underlying the challenged aspects of § 4–1.2 is to provide for the just and orderly disposition of property at death.[6] We long have recognized that this is an area with which the States have an interest of considerable magnitude. *Trimble, supra,* at 771; *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S., at 170; *Labine* v. *Vincent,* 401 U. S., at 538; see also *Lyeth* v. *Hoey,* 305 U. S. 188, 193 (1938); *Mager* v. *Grima,* 8 How. 490, 493 (1850).

This interest is directly implicated in paternal inheritance by illegitimate children because of the peculiar problems of proof that are involved. Establishing maternity is seldom difficult. As one New York Surrogate's Court has observed: "[T]he birth of the child is a recorded or registered event usually taking place in the presence of others. In most cases the child remains with the mother and for a time is necessarily reared by her. That the child is the child of a particular woman is rarely difficult to prove." *In re Ortiz,* 60 Misc. 2d

---

[6] The presence in this case of the State's interest in the orderly disposition of a decedent's property at death distinguishes it from others in which that justification for an illegitimacy-based classification was absent. *E. g., Jimenez* v. *Weinberger,* 417 U. S. 628 (1974); *Gomez* v. *Perez,* 409 U. S. 535 (1973); *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164, 170 (1972); *Levy* v. *Louisiana,* 391 U. S. 68 (1968).

756, 761, 303 N. Y. S. 2d 806, 812 (1969). Proof of paternity, by contrast, frequently is difficult when the father is not part of a formal family unit. "The putative father often goes his way unconscious of the birth of a child. Even if conscious, he is very often totally unconcerned because of the absence of any ties to the mother. Indeed the mother may not know *who* is responsible for her pregnancy." *Ibid.* (emphasis in original); accord, *In re Flemm,* 85 Misc. 2d 855, 861, 381 N. Y. S. 2d 573, 576–577 (Surr. Ct. 1975); *In re Hendrix,* 68 Misc. 2d, at 443, 326 N. Y. S. 2d, at 650; cf. *Trimble, supra,* at 770, 772.

Thus, a number of problems arise that counsel against treating illegitimate children identically to all other heirs of an intestate father. These were the subject of a comprehensive study by the Temporary State Commission on the Modernization, Revision and Simplification of the Law of Estates. This group, known as the Bennett Commission,[7] consisted of individuals experienced in the practical problems of estate administration. *In re Flemm, supra,* at 858, 381 N. Y. S. 2d, at 575. The Commission issued its report and recommendations to the legislature in 1965. See Fourth Report of the Temporary State Commission on the Modernization, Revision and Simplification of the Law of Estates, Legis. Doc. No. 19 (1965) (hereinafter Commission Report). The statute now codified as § 4–1.2 was included.

Although the overarching purpose of the proposed statute was "to alleviate the plight of the illegitimate child," Commission Report 37, the Bennett Commission considered it necessary to impose the strictures of § 4–1.2 in order to mitigate serious difficulties in the administration of the estates of

---

[7] The Bennett Commission was created by the New York Legislature in 1961. It was instructed to recommend needed changes in certain areas of state law, including that pertaining to "the descent and distribution of property, and the practice and procedure relating thereto." 1961 N. Y. Laws, ch. 731, § 1.

both testate and intestate decedents. The Commission's perception of some of these difficulties was described by Surrogate Sobel, a member of "the busiest [surrogate's] court in the State measured by the number of intestate estates which traffic daily through this court," *In re Flemm, supra,* at 857, 381 N. Y. S. 2d, at 574, and a participant in some of the Commission's deliberations:

"An illegitimate, if made an unconditional distributee in intestacy, must be served with process in the estate of his parent or if he is a distributee in the estate of the kindred of a parent. . . . And, in probating the will of his parent (though not named a beneficiary) or in probating the will of any person who makes a class disposition to 'issue' of such parent, the illegitimate must be served with process. . . . How does one cite and serve an illegitimate of whose existence neither family nor personal representative may be aware? And of greatest concern, how achieve finality of decree in *any* estate when there always exists the possibility however remote of a secret illegitimate lurking in the buried past of a parent or an ancestor of a class of beneficiaries? Finality in decree is essential in the Surrogates' Courts since title to real property passes under such decree. Our procedural statutes and the Due Process Clause mandate notice and opportunity to be heard to all necessary parties. Given the right to intestate succession, *all* illegitimates must be served with process. This would be no real problem with respect to those few estates where there are 'known' illegitimates. But it presents an almost insuperable burden as regards 'unknown' illegitimates. The point made in the [Bennett] commission discussions was that instead of affecting only a few estates, procedural problems would be created for many—some members suggested a majority—of estates." 85 Misc. 2d, at 859, 381 N. Y. S. 2d, at 575–576.

Cf. *In re Leventritt*, 92 Misc. 2d 598, 601–602, 400 N. Y. S. 2d 298, 300–301 (Surr. Ct. 1977).

Even where an individual claiming to be the illegitimate child of a deceased man makes himself known, the difficulties facing an estate are likely to persist. Because of the particular problems of proof, spurious claims may be difficult to expose. The Bennett Commission therefore sought to protect "innocent adults and those rightfully interested in their estates from fraudulent claims of heirship and harassing litigation instituted by those seeking to establish themselves as illegitimate heirs." Commission Report 265.

## C

As the State's interests are substantial, we now consider the means adopted by New York to further these interests. In order to avoid the problems described above, the Commission recommended a requirement designed to ensure the accurate resolution of claims of paternity and to minimize the potential for disruption of estate administration. Accuracy is enhanced by placing paternity disputes in a judicial forum during the lifetime of the father. As the New York Court of Appeals observed in its first opinion in this case, the "availability [of the putative father] should be a substantial factor contributing to the reliability of the fact-finding process." *In re Lalli*, 38 N. Y. 2d, at 82, 340 N. E. 2d, at 724. In addition, requiring that the order be issued during the father's lifetime permits a man to defend his reputation against "unjust accusations in paternity claims," which was a secondary purpose of § 4–1.2. Commission Report 266.

The administration of an estate will be facilitated, and the possibility of delay and uncertainty minimized, where the entitlement of an illegitimate child to notice and participation is a matter of judicial record before the administration commences. Fraudulent assertions of paternity will be much less likely to succeed, or even to arise, where the proof is put

before a court of law at a time when the putative father is available to respond, rather than first brought to light when the distribution of the assets of an estate is in the offing.[8]

Appellant contends that § 4–1.2, like the statute at issue in *Trimble*, excludes "significant categories of illegitimate children" who could be allowed to inherit "without jeopardizing the orderly settlement" of their intestate fathers' estates. *Trimble*, 430 U. S., at 771. He urges that those in his position—"known" illegitimate children who, despite the absence of an order of filiation obtained during their fathers' lifetimes, can present convincing proof of paternity—cannot rationally be denied inheritance as they pose none of the risks § 4–1.2 was intended to minimize.[9]

We do not question that there will be some illegitimate children who would be able to establish their relationship to

---

[8] In affirming the judgment below, we do not, of course, restrict a State's freedom to require proof of paternity by means other than a judicial decree. Thus, a State may prescribe any *formal* method of proof, whether it be similar to that provided by § 4–1.2 or some other regularized procedure that would assure the authenticity of the acknowledgment. As we noted in *Trimble*, 430 U. S., at 772 n. 14, such a procedure would be sufficient to satisfy the State's interests. See also n. 11, *infra*.

[9] Appellant claims that in addition to discriminating between illegitimate and legitimate children, § 4–1.2, in conjunction with N. Y. Dom. Rel. Law § 24 (McKinney 1977), impermissibly discriminates between classes of illegitimate children. Section 24 provides that a child conceived out of wedlock is nevertheless legitimate if, before or after his birth, his parents marry, even if the marriage is void, illegal, or judicially annulled. Appellant argues that by classifying as "legitimate" children born out of wedlock whose parents later marry, New York has, with respect to these children, substituted marriage for § 4–1.2's requirement of proof of paternity. Thus, these "illegitimate" children escape the rigors of the rule unlike their unfortunate counterparts whose parents never marry.

Under § 24, one claiming to be the legitimate child of a deceased man would have to prove not only his paternity but also his maternity and the fact of the marriage of his parents. These additional evidentiary requirements make it reasonable to accept less exacting proof of paternity and to treat such children as legitimate for inheritance purposes.

their deceased fathers without serious disruption of the administration of estates and that, as applied to such individuals, § 4–1.2 appears to operate unfairly. But few statutory classifications are entirely free from the criticism that they sometimes produce inequitable results. Our inquiry under the Equal Protection Clause does not focus on the abstract "fairness" of a state law, but on whether the statute's relation to the state interests it is intended to promote is so tenuous that it lacks the rationality contemplated by the Fourteenth Amendment.

The Illinois statute in *Trimble* was constitutionally unacceptable because it effected a total statutory disinheritance of children born out of wedlock who were not legitimated by the subsequent marriage of their parents. The reach of the statute was far in excess of its justifiable purposes. Section 4–1.2 does not share this defect. Inheritance is barred only where there has been a failure to secure evidence of paternity during the father's lifetime in the manner prescribed by the State. This is not a requirement that inevitably disqualifies an unnecessarily large number of children born out of wedlock.

The New York courts have interpreted § 4–1.2 liberally and in such a way as to enhance its utility to both father and child without sacrificing its strength as a procedural prophylactic. For example, a father of illegitimate children who is willing to acknowledge paternity can waive his defenses in a paternity proceeding, *e. g., In re Thomas*, 87 Misc. 2d 1033, 387 N. Y. S. 2d 216 (Surr. Ct. 1976), or even institute such a proceeding himself.[10] N. Y. Family Court Act § 522 (McKinney Supp. 1978); *In re Flemm*, 85 Misc. 2d, at 863, 381 N. Y. S. 2d, at 578. In addition, the courts have excused "technical" failures by illegitimate children to comply with

---

[10] In addition to making intestate succession possible, of course, a father is always free to provide for his illegitimate child by will. See *In re Flemm*, 85 Misc. 2d 855, 864, 381 N. Y. S. 2d 573, 579 (Surr. Ct. 1975).

the statute in order to prevent unnecessary injustice. *E. g.,* *In re Niles,* 53 App. Div. 2d 983, 385 N. Y. S. 2d 876 (1976), appeal denied, 40 N. Y. 2d 809, 392 N. Y. S. 2d 1027 (1977) (filiation order may be signed *nunc pro tunc* to relate back to period prior to father's death when court's factual finding of paternity had been made); *In re Kennedy,* 89 Misc. 2d 551, 554, 392 N. Y. S. 2d 365, 367 (Surr. Ct. 1977) (judicial support order treated as "tantamount to an order of filiation," even though paternity was not specifically declared therein).

As the history of § 4–1.2 clearly illustrates, the New York Legislature desired to "grant to illegitimates *in so far as practicable* rights of inheritance on a par with those enjoyed by legitimate children," Commission Report 265 (emphasis added), while protecting the important state interests we have described. Section 4–1.2 represents a carefully considered legislative judgment as to how this balance best could be achieved.

Even if, as MR. JUSTICE BRENNAN believes, § 4–1.2 could have been written somewhat more equitably, it is not the function of a court "to hypothesize independently on the desirability or feasibility of any possible alternative[s]" to the statutory scheme formulated by New York. *Mathews* v. *Lucas,* 427 U. S., at 515. "These matters of practical judgment and empirical calculation are for [the State]. . . . In the end, the precise accuracy of [the State's] calculations is not a matter of specialized judicial competence; and we have no basis to question their detail beyond the evident consistency and substantiality." *Id.,* at 515–516.[11]

---

[11] The dissent of MR. JUSTICE BRENNAN would reduce the opinion in *Trimble* v. *Gordon, supra,* to a simplistic holding that the Constitution *requires* a State, in a case of this kind, to recognize as sufficient any "formal acknowledgment of paternity." This reading of *Trimble* is based on a single phrase lifted from a footnote. 430 U. S., at 772 n. 14. It ignores both the broad rationale of the Court's opinion and the context in

We conclude that the requirement imposed by § 4–1.2 on illegitimate children who would inherit from their fathers is substantially related to the important state interests the stat-

---

which the note and the phrase relied upon appear. The principle that the footnote elaborates is that the States are free to recognize the problems arising from different forms of proof and to select those forms "carefully tailored to eliminate imprecise and unduly burdensome methods of establishing paternity." *Ibid.* The New York Legislature, with the benefit of the Bennett Commission's study, exercised this judgment when it considered and rejected the possibility of accepting evidence of paternity less formal than a judicial order. Commission Report 266–267.

The "formal acknowledgment" contemplated by *Trimble* is such as would minimize post-death litigation, *i. e.,* a regularly prescribed, legally recognized method of acknowledging paternity. See n. 8, *supra.* It is thus plain that footnote in *Trimble* does not sustain the dissenting opinion. Indeed, the document relied upon by the dissent is not an acknowledgment of paternity at all. It is a simple "Certificate of Consent" that apparently was required at the time by New York for the marriage of a minor. It consists of one sentence:

"THIS IS TO CERTIFY that I, who have hereto subscribed my name, do hereby consent that Robert Lalli who is my son and who is under the age of 21 years, shall be united in marriage to Janice Bivins by any minister of the gospel or other person authorized by law to solemnize marriages." App. A–14.

Mario Lalli's signature to this document was acknowledged by a notary public, but the certificate contains no oath or affirmation as to the truth of its contents. The notary did no more than confirm the identity of Lalli. Because the certificate was executed for the purpose of giving consent to marry, not of proving biological paternity, the meaning of the words "my son" is ambiguous. One can readily imagine that had Robert Lalli's half-brother, who was not Mario's son but who took the surname Lalli and lived as a member of his household, sought permission to marry, Mario might also have referred to him as "my son" on a consent certificate.

The important state interests of safeguarding the accurate and orderly disposition of property at death, emphasized in *Trimble* and reiterated in our opinion today, could be frustrated easily if there were a constitutional rule that any notarized but unsworn statement identifying an individual as a "child" must be accepted as adequate proof of paternity regardless of the context in which the statement was made.

ute is intended to promote. We therefore find no violation of the Equal Protection Clause.

The judgment of the New York Court of Appeals is

*Affirmed.*

For the reasons stated in his dissent in *Trimble* v. *Gordon,* 430 U. S. 762, 777 (1977), MR. JUSTICE REHNQUIST concurs in the judgment of affirmance.

MR. JUSTICE STEWART, concurring.

It seems to me that MR. JUSTICE POWELL's opinion convincingly demonstrates the significant differences between the New York law at issue here and the Illinois law at issue in *Trimble* v. *Gordon,* 430 U. S. 762. Therefore, I cannot agree with the view expressed in MR. JUSTICE BLACKMUN's opinion concurring in the judgment that *Trimble* v. *Gordon* is now "a derelict," or with the implication that in deciding the two cases the way it has this Court has failed to give authoritative guidance to the courts and legislatures of the several States.

MR. JUSTICE BLACKMUN, concurring in the judgment.

I agree with the result the Court has reached and concur in its judgment. I also agree with much that has been said in the plurality opinion. My point of departure, of course, is at the plurality's valiant struggle to distinguish, rather than overrule, *Trimble* v. *Gordon,* 430 U. S. 762 (1977), decided just the Term before last, and involving a small probate estate (an automobile worth approximately $2,500) and a sad and appealing fact situation. Four Members of the Court, like the Supreme Court of Illinois, found the case "constitutionally indistinguishable from *Labine* v. *Vincent,* 401 U. S. 532 (1971)," and were in dissent. *Id.,* at 776, 777.

It seems to me that the Court today gratifyingly reverts to the principles set forth in *Labine* v. *Vincent.* What Mr. Justice Black said for the Court in *Labine* applies with equal

force to the present case and, as four of us thought, to the Illinois situation with which *Trimble* was concerned.

I would overrule *Trimble,* but the Court refrains from doing so on the theory that the result in *Trimble* is justified because of the peculiarities of the Illinois Probate Act there under consideration. This, of course, is an explanation, but, for me, it is an unconvincing one. I therefore must regard *Timble* as a derelict, explainable only because of the overtones of its appealing facts, and offering little precedent for constitutional analysis of State intestate succession laws. If *Trimble* is not a derelict, the corresponding statutes of other States will be of questionable validity until this Court passes on them, one by one, as being on the *Trimble* side of the line or the *Labine-Lalli* side.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE WHITE, MR. JUSTICE MARSHALL, and MR. JUSTICE STEVENS join, dissenting.

*Trimble* v. *Gordon,* 430 U. S. 762 (1977), declares that the state interest in the accurate and efficient determination of paternity can be adequately served by requiring the illegitimate child to offer into evidence a "formal acknowledgment of paternity." *Id.,* at 772 n. 14. The New York statute is inconsistent with this command. Under the New York scheme, an illegitimate child may inherit intestate only if there has been a judicial finding of paternity during the lifetime of the father.

The present case illustrates the injustice of the departure from *Trimble* worked by today's decision sustaining the New York rule. All interested parties concede that Robert Lalli is the son of Mario Lalli. Mario Lalli supported Robert during his son's youth. Mario Lalli formally acknowledged Robert Lalli as his son. See *In re Lalli,* 38 N. Y. 2d 77, 79, 340 N. E. 2d 721, 722 (1975). Yet, for want of a judicial order of filiation entered during Mario's lifetime, Robert Lalli is denied his intestate share of his father's estate.

There is no reason to suppose that the injustice of the present case is aberrant. Indeed it is difficult to imagine an instance in which an illegitimate child, acknowledged and voluntarily supported by his father, would ever inherit intestate under the New York scheme. Social welfare agencies, busy as they are with errant fathers, are unlikely to bring paternity proceedings against fathers who support their children. Similarly, children who are acknowledged and supported by their fathers are unlikely to bring paternity proceedings against them. First, they are unlikely to see the need for such adversary proceedings. Second, even if aware of the rule requiring judicial filiation orders, they are likely to fear provoking disharmony by suing their fathers. For the same reasons, mothers of such illegitimates are unlikely to bring proceedings against the fathers. Finally, fathers who do not even bother to make out wills (and thus die intestate) are unlikely to take the time to bring formal filiation proceedings. Thus, as a practical matter, by requiring judicial filiation orders entered during the lifetime of the fathers, the New York statute makes it virtually impossible for acknowledged and freely supported illegitimate children to inherit intestate.

Two interests are said to justify this discrimination against illegitimates. First, it is argued, reliance upon mere formal public acknowledgments of paternity would open the door to fraudulent claims of paternity. I cannot accept this argument. I adhere to the view that when "a father has formally acknowledged his child . . . there is no possible difficulty of proof, and no opportunity for fraud or error. This purported interest ʻ[in avoiding fraud] . . . can offer no justification for distinguishing between a formally acknowledged illegitimate child and a legitimate one." *Labine* v. *Vincent*, 401 U. S. 532, 552 (1971) (BRENNAN, J., dissenting).

But even if my confidence in the accuracy of formal public acknowledgments of paternity were unfounded, New York has available less drastic means of screening out fraudulent

claims of paternity. In addition to requiring formal acknowledgments of paternity, New York might require illegitimates to prove paternity by an elevated standard of proof, *e. g.,* clear and convincing evidence, or even beyond a reasonable doubt. Certainly here, where there is no factual dispute as to the relationship between Robert and Mario Lalli, there is no justification for denying Robert Lalli his intestate share.

Second, it is argued, the New York statute protects estates from belated claims by unknown illegitimates. I find this justification even more tenuous than the first. Publication notice and a short limitations period in which claims against the estate could be filed could serve the asserted state interest as well as, if not better than, the present scheme. In any event, the fear that unknown illegitimates might assert belated claims hardly justifies cutting off the rights of known illegitimates such as Robert Lalli. I am still of the view that the state interest in the speedy and efficient determination of paternity "is completely served by public acknowledgment of parentage and simply does not apply to the case of acknowledged illegitimate children." *Id.,* at 558 n. 30 (BRENNAN, J., dissenting).

I see no reason to retreat from our decision in *Trimble* v. *Gordon.* The New York statute on review here, like the Illinois statute in *Trimble,* excludes "forms of proof which do not compromise the State['s] interests." *Trimble* v. *Gordon, supra,* at 772 n. 14. The statute thus discriminates against illegitimates through means not substantially related to the legitimate interests that the statute purports to promote. I would invalidate the statute.