2535

Charles FREEMAN and Mae Freeman Hall, Respondents v. Carl FREE-
MAN, Errol Freeman, Wanda Freeman Ravenel, John Freeman Jr.,
Lawrence Freeman, Kenneth Freeman, Marvin Freeman, Barbara Free-
man Washington, Sophie Gathers, Beatrice Gathers Venning, Edward
Gathers, Mary Alice Gathers, Gloria Freeman, if they be alive, and
Richard Roe and Mary Roe, adults whose true names are unknown, John
Doe and Jane Doe, infants, incompetents, persons under disability, or
persons in the military service, if any, whose true names are unknown,
these four names being fictitious names designating the unknown heirs,
divisees, distributees, issues, executors, administrators, personal repre-
sentatives, successors, and/or assigns of Lawrence Maxwell, John R.
Freeman, Hardy Freeman, John Freeman, Mary Freeman Gathers, Wal-
ter Freeman, Fred Gathers, Palmer Gathers, and James Gathers, de-
ceased, and also all other persons unknown claiming any right, title, es-
tate, interest in or lien upon the real estate described in the Complaint
herein; and The United States of America, by and through its agency,
The Internal Revenue Service, Defendants, of whom Carl Freeman,
Errol Freeman, Wanda Freeman Ravenel, John Freeman Jr., Lawrence
Freeman, Kenneth Freeman, Marvin Freeman and Barbara Freeman
Washington are, Appellants.

(473 S.E. (2d) 467)

Court of Appeals

*Ivan N. Nossokoff* and *Bruce A. Berlinsky*, Charleston, *for appellants.*

*John A. Von Lehe*, Mt. Pleasant, *for respondents.*

Heard May 7, 1996.

Decided July 8, 1996.

HOWELL, Chief Judge:

Charles Freeman (Charles) and Mae Freeman Hall (Mae) brought an action to quiet title and for partition and sale of real property against the heirs of John R. Freeman (John I). The case was referred to the master in equity for final judgment, with any appeal being directly to the Supreme Court. The master found in favor of Charles and Mae, and the heirs of the second John R. Freeman (the Freemans) appeal. We affirm in part, reverse in part and remand.

## FACTS

This case involves the ownership of about one acre of property in Charleston County. Title to the property was acquired by John R. Freeman by deed in 1936. There are two persons with the name "John R. Freeman." John R. Freeman (John I) had five children: Walter Freeman, who died intestate and left no heirs; Marie Gathers, who died intestate and was survived by eight children; John R. Freeman (John II), who died intestate and left eight surviving children; Henry Freeman, a/k/a Hardy (Henry), who died intestate and was survived by Mae, who claims to be Henry's illegitimate daughter; and Charles Freeman. Charles and Mae entered into a contract to sell the property and brought this action to quiet title and to partition the property by sale. Following a hearing, the master determined (1) the 1936 deed was to John I; (2) Mae was an heir of

John I by virtue of representation through Henry; and (3) the contract for sale of the property was fair and valid. This appeal followed.

## STANDARD OF REVIEW

This is an action in equity. *Van Every v. Chinquapin Hollow, Inc.*, 265 S.C. 474, 219 S.E. (2d) 909 (1975) (an action to remove a cloud on and to quiet title to land is one in equity); *Wilson v. McGuire*, — S.C. —, 463 S.E. (2d) 614 (Ct. App. 1995) (a partition action is equitable). Therefore, this court may view the evidence to determine facts in accordance with its own view of the preponderance of the evidence, though we are not required to disregard the findings of the master. *Friarsgate, Inc. v. First Fed. Sav. & Loan Ass'n.*, — S.C. —, 454 S.E. (2d) 901 (Ct. App. 1995); *Provident Life & Accident Ins. Co. v. Driver*, — S.C. —, 451 S.E. (2d) 924 (Ct. App. 1994). Nor are we required to ignore the fact that the master, who saw and heard the witnesses, is in a better position to evaluate their credibility. *Cherry v. Thomasson*, 276 S.C. 524, 280 S.E. (2d) 541 (1981).

## DISCUSSION

### I. *Title to Property*

The Freemans first argue the master erred in finding the deed was to John I and not John II. We disagree.

On November 13, 1936, the Forfeited Land Commission deeded the Charleston property to "John R. Freeman." At the time of the conveyance both John I and John II lived on the property. John I was the father of John II, who was seventeen-years-old at the time of the conveyance. If the 1936 deed was to John I, then his heirs, including Charles and arguably Mae, own the property; however, if the deed was to John II, only his heirs own the property, so that Charles and Mae have no claim.

In the early 1930s, John I and his family moved into a home owned by Mr. Oree and remained there while John I worked, first as a farmer and then with the government under the WPA. John I purchased and stored lumber until he accumulated enough to build a home. The property was purchased in 1936. In the late 1930s, John I built a home upon the property. Eventually John II built a home on the property in front of

John I's house. John I continued to live on the property until his death in 1961. John II also lived on the property and paid the taxes as far back as 1953. When John II received $2,000 from the highway department when the road near the property was widened, he distributed the money to people other than his immediate family. John II died intestate in 1992.

The evidence is consistent with John I obtaining title to the property and allowing John II to live there rent-free so long as he paid the taxes and maintained the property. Significantly, John II was only 17-years-old when the property was purchased. From our own view of the evidence, we find it more likely than not the 1936 deed was to John I, and not to his 17-year-old son. Accordingly, we affirm the master's finding the deed was to John I.

## II. *Ouster*

The Freemans next contend the master erred in failing to find they established acts which constituted "ouster" of Charles and Mae. We disagree.

"Ouster" is the actual turning out or keeping excluded a party entitled to possession of any real property. *Grant v. Grant*, 288 S.C. 86, 340 S.E. (2d) 791 (Ct. App. 1986). The possession of one tenant in common is the possession of all and, for one tenant to establish title against a co-tenant by adverse possession, he must overcome the strong presumption that he holds possession in recognition of the co-tenancy. *Felder v. Fleming*, 278 S.C. 327, 295 S.E. (2d) 640 (1982); *Horne v. Cox*, 237 S.C. 41, 115 S.E. (2d) 513 (1960). Actual ouster of a tenant in common by a cotenant in possession occurs when the possession is attended with such circumstances as to evince a claim of exclusive right and title and a denial of the right of the other tenants to participate in the profits. *Woods v. Bivens*, 292 S.C. 76, 354 S.E. (2d) 909 (1987); *Brevard v. Fortune*, 221 S.C. 117, 69 S.E. (2d) 355 (1952). The acts relied upon to establish an ouster must be of an unequivocal nature, and so distinctly hostile to the rights of the other cotenants that the intention to disseize is clear and unmistakable. *Felder*, 278 S.C. at 330, 295 S.E. (2d) at 642. Only in rare, extreme cases will the ouster by one cotenant of other cotenants be implied from exclusive possession and dealings with the property, such as collection of rents and improvement of the property. *Id.*, 278 S.C. at 331, 295 S.E. (2d) at 642;

*see also Horne,* 237 S.C. at 45, 115 S.E. (2d) at 515 (while a "turning out by the heels" is not necessary in establishing title by a tenant in common by adverse possession, nevertheless an actual ouster and an exclusion of the other tenants from possession must be shown and the acts relied upon to establish such ouster must by of an unequivocal nature and so distinctly hostile to the rights of the other cotenants that intention of ouster is clear and unmistakable).

The master found John II's failure to indicate there were joint owners of the property when he applied for a homestead exemption for the property was not adverse to the rights of the other cotenants. Rather, the master found the net effect of this action was to reduce taxes. Furthermore, although John II spoke of devising the property to his son, he never followed through with the transfer. Finally, the fact that John II paid the taxes during his occupancy of the property does not amount to ouster. *See Watson v. Little,* 224 S.C. 359, 79 S.E. (2d) 384 (1953) (payment of taxes by a cotenant ordinarily entitles him only to a proportionate contribution from the other cotenants). Accordingly, we agree with the master that John II's adverse acts were not sufficient to show the clear and unmistakable intention required to constitute ouster.

### III. *Mae's Right to Inherit*

The Freemans argue the master erred in finding Mae could inherit a portion of John I's estate by virtue of representation of Henry's share. We agree.

Mae argues she is the rightful heir of Henry and the master's decision to allow her to share in the proceeds from the sale of the property should be affirmed because: (1) she was treated as a family member until this action to quiet title; (2) she took care of Henry for the last few years of his life; (3) she shared in the proceeds paid by the highway department after it widened the road and took a portion of the property; (4) she was consulted by Charles about selling the property because he considered her an heir and because he thought "it was the right thing to do"; and (5) nothing was done to contest her paternity within six-months of Henry's death.

Mae contends the master correctly relied on *Parker v. Parker,* 313 S.C. 482, 443 S.E. (2d) 388 (1994). We disagree. In *Parker* the South Carolina Supreme Court held if paternity is

questioned by an interested party then the action must be brought within the time required by statute. *Parker*, 313 S.C. at 486, 443 S.E. (2d) at 390. In *Parker*, heirs were barred from questioning a daughter's paternity because they waited nearly four years after the father's death to challenge paternity. *Parker*, 313 S.C. at 485-86, 443 S.E. (2d) at 390 (noting that at the time of the father's death, § 62-2-109 required paternity be established by an adjudication commenced before or within six months after the death of the father and, if after his death, by clear and convincing proof) (interpreting S.C. Code Ann. § 62-2-109 (1989)).

In this case, the master held Mae's interest in the property vested when her father died and, because no one brought an action questioning her paternity within six months after the death of her father, then no one could question her paternity now. There are several reasons why *Parker* is not applicable. Henry died in 1968. Under South Carolina law in 1968, illegitimate children could only inherit from their mothers. *See* S.C. Code Ann. § 19-53 (1962). The South Carolina statute interpreted in *Parker* was not enacted until 1987. Also, in *Parker* the father's estate was probated and the illegitimate daughter was listed as his daughter on the petition for informal probate and she was involved in the probate matters and hearings for several years before anyone challenged her paternity. *Parker*, 313 S.C. at 484, 443 S.E. (2d) at 389. There is no evidence that Henry's estate was ever probated. In fact, Mae testified she did not receive anything from Henry's estate upon his death.[1]

The proper analysis to apply to Mae's situation is under the South Carolina Supreme Court's interpretation of a landmark United States Supreme Court case. In 1977, the U.S. Supreme Court held an Illinois statute which barred an illegitimate child from inheriting from the child's father unless the father acknowledged the child *and* the child's parents eventually married,[2] violated the Equal Protection Clause of the Four-

---

[1] Nor can Mae's receipt of proceeds from the highway department be viewed as a partial distribution of Henry's estate from when time began to run. It occurred after Henry died in 1968 and before John II died in 1992. Prior to 1987, there was no statute similar to that in *Parker*. There is no evidence in the record the proceeds were distributed in 1987 or later.

[2] The statute stated, in part, "[a] child who was illegitimate whose parents inter-marry and who is acknowledged by the father as the father's child is legitimate." Ill. Rev. Stat. ch. 3, § 12 (1973) (quoted in *Trimble*, 430 U.S. at 765, 97 S.Ct. at 1462-63).

teenth Amendment of the United States Constitution. *Trimble v. Gordon*, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed. 31 (1977) (noting that under the Illinois statute, even a judicial declaration of paternity would be insufficient to allow the child to inherit). In *Trimble*, there was a paternity order finding Gordon to be the father of Trimble and ordering Gordon to pay child support. *Id.* at 764, 97 S.Ct. at 1462. The paternity order was entered in 1973 and Gordon paid child support and openly acknowledged Trimble as his child until his death in 1974. *Id.* The lower courts refused to allow Trimble to inherit from Gordon's estate. The Court stated:

> For at least some significant categories of illegitimate children of intestate men, inheritance rights can be recognized without jeopardizing the orderly settlement of estates or the dependability of titles to property passing under intestacy laws.

*Id.* at 771, 97 S.Ct. at 1465.[3]

The Court also recognized problems with respect to proof of paternity but stressed that such problems could not be "an impenetrable barrier that works to shield otherwise invidious discrimination." *Id.*

The South Carolina Supreme Court adopted *Trimble* and ruled a South Carolina statute allowing illegitimate children to inherit only from their mothers' estates violated the Equal Protection Clause. *Wilson v. Jones*, 281 S.C. 230, 314 S.E. (2d) 341 (1984) (finding S.C. Code Ann. § 21-3-30 (1976) unconstitutional). However, the court refused to apply *Trimble* retroactively, and held only those illegitimate children whose fathers died after April 26, 1977 could inherit from their fathers' es-

---

[3] The Court noted the difficult judicial task of vindicating constitutional rights without interfering unduly with the State's primary responsibility in the area of inheritance.

> The orderly disposition of property at death requires an appropriate legal framework, the structuring of which is a matter particularly within the competence of the individual States. In exercising this responsibility, a State necessarily must enact laws governing both the procedure and substance of intestate succession. Absent infringement of a constitutional right, the federal courts have no role here, and, even when constitutional violations are alleged, those courts should accord substantial deference to a State's statutory scheme of inheritance.

*Trimble*, 430 U.S. at 771, 97 S.Ct. at 1465.

tates. *Wilson*, 281 S.C. at 233, 314 S.E. (2d) at 343. Four years later the court modified *Wilson* and allowed limited retroactive application of *Trimble*. *See Mitchell v. Hardwick*, 297 S.C. 48, 374 S.E. (2d) 681 (1988). In *Mitchell*, the court allowed illegitimate children to inherit from their fathers' estates if the following three conditions were met: (1) innocent persons would not be adversely affected because of their detrimental reliance on the old rule; (2) the paternity of the child had been conclusively established either by court order or decree issued prior to the death of the father or by an instrument signed by the father acknowledging paternity; and (3) the estate administration was subject to further resolution. *Id.*, 297 S.C. at 51, 374 S.E. (2d) at 683 (finding undisputed evidence Mitchell was his father's son and allowing Mitchell to inherit because all three conditions were satisfied).

Here, the first and third requirements are satisfied because there is no evidence innocent persons would be adversely affected by detrimentally relying on the old inheritance laws nor is there evidence Henry's estate was ever probated. The insurmountable problem Mae confronts is the difficulty of proving paternity. While Mae cannot meet the strict requirement of *Mitchell*, there is evidence Mae is Henry's daughter. Mae's birth certificate lists "Henry Freeman" as her father although her parents never married. Mae never initiated any action to establish Henry as her father. Henry lived with Mae on and off from 1966 until he died in 1968. However, Henry died intestate and Mae testified she did not receive anything upon his death. While the record contains persuasive evidence that Mae is Henry's daughter, *Mitchell* prevents Mae from inheriting Henry's portion of John I's estate because paternity was not conclusively established either by a court order issued prior to Henry's death or by an instrument signed by Henry acknowledging paternity of Mae.[4]

South Carolina's limits on the retroactive application of *Trimble* is constitutional. One year after *Trimble* the Court found equal protection could be limited by a state. *See Lalli v. Lalli*, 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed. (2d) 503 (1978). In *Lalli*, the Court interpreted a New York

---

[4] Although Henry's name is on the birth certificate, his signature is not.

statute[5] which required an order of paternity be issued *during* the life of the father, in order for the illegitimate child to inherit. *Id.* The illegitimate child introduced into evidence a notarized document in which the father referred to him as "my son" and also submitted affidavits which stated the father had openly acknowledged the child as his. *Id.* at 263, 99 S.Ct. at 522. Even with this evidence, the Court did not allow the child to inherit. The test the Court applied was whether the procedural demands of the statute were substantially related to a particular state interest the statute was designed to serve.[6] *Id.* at 268, 99 S.Ct. at 524-25. The Court held the statute did not violate the Equal Protection Clause even though it prevented some illegitimate children who could establish paternity without serious disruption of the administration of estates from inheriting. *Id.* at 272-73, 99 S.Ct. at 526-25. The Court's focus was not on fairness but on the government's interest.

> We do not question that there will be some illegitimate children who would be able to establish their relationship to their deceased fathers without serious disruption of the administration of estates and that, as applied to such individuals, [the statute] appears to operate unfairly. But few statutory classifications are entirely free from the criticism that they sometimes produce inequitable results. Our inquiry under the Equal Protection Clause does not focus on the abstract "fairness" of a state law, but on whether the statute's relation to the state interests it is intended to promote is so tenuous that it lacks the rationality contemplated by the Fourteenth Amendment.

---

[5] An illegitimate child is the legitimate child of his father so that he and his issue inherit from his father if a court of competent jurisdiction had, during the lifetime of the father, made an order of filiation declaring paternity in a proceeding instituted during the pregnancy of the mother or within two years from the birth of the child.

N.Y. Est., Powers & Trusts Law § 4-1.2(a)(2) (McKinney 1967) (quoted in *Lalli*, 439 U.S. at 261-62, 99 S.Ct. at 521-22).

[6] The intermediate level of scrutiny, substantially related to an important government interest, was adopted for illegitimacy in 1988. *See Clark v. Jeter*, 486 U.S. 456, 460-62, 108 S.Ct. 1910, 1913-15, 100 L.Ed. (2d) 465 (1988). However, pre-1988 decisions of the Court are consistent with this form of intermediate standard of review. Rotunda & Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 18.19, at 260 (2d ed. 1992).

*Id.*

The South Carolina Supreme Court noted the three major arguments against the retroactive application of *Trimble* were: (1) it would disrupt the orderly probate process; (2) paternity was inherently difficult to prove; and (3) it would impair the rights of others who detrimentally relied on the old law. *See Mitchell,* 297 S.C. at 51, 374 S.E. (2d) at 682-83.

We, of course, are bound by the decisions of the South ■ Carolina Supreme Court. *Johnston v. Pittman,* 298 S.C. 390, 380 S.E. (2d) 850 (Ct. App. 1989). Therefore, we can not allow Mae to inherit as Henry's heir.

### IV. *Real Estate Contract*

Finally, the Freemans complain the master erred in finding the terms of the sales contract and the real estate commission payable under the contract fair and equitable and, also, erred in failing to properly address these issues. We find no error.

The master asked Charles if the property could be di- ■ vided into equal parcels and Charles responded the property was too small. Renee Brockington was a realtor who assisted Mae in selling land not the subject of this suit. Later Charles and Mae received an offer to sell the property to Brockington's brother, Thomas Ravenel.[7] Mae had looked through a multiple listing book at nearby parcels, and decided the offered price of $240,000 was fair. The sale price for the property was reduced to $227,500 because Ravenel was paying the cost of clearing title and removing two buildings from the site. A real estate appraiser valued the property at $248,000. However, the cost of removing the two houses was not taken into consideration.

During the examination of Mae, defense counsel asked ■ if Mae thought the ten percent commission was fair.

Mae did not respond, but the master stated "10 percent is commonplace on unimproved land, undeveloped land, in this area, commercial property. Whether or not she thinks it's fair—some people might not think a 6 percent on improved property is fair." When the master asked if defense counsel suggested the commission should apply only to Mae's interest,

---

[7] Mae did not know Ravenel and Brockington were siblings, but testified it made no difference as Brockington was fair in her dealings with Mae and Charles.

counsel replied it would be "across the board." Defense counsel then withdrew the question. At no time did counsel object to the master's remarks, nor did counsel offer any evidence that 10 percent sales commission was unusual for this type of property. Following the close of the evidence, counsel did ask the master to consider that the ten percent commission was negotiated through an "insider transaction, and with no support as to what they did to earn a commission." In his order denying the Freemans' Rule 59(e) motion, the master noted the contract price was $227,500 rather than $240,000, but added the price was fair and adequate because the buyer was paying the cost of clearing the title as well as removing the buildings from the site. We construe this as a ruling that the terms of the contract as well as the costs associated with the contract were not unusual and were reasonable, and there was no evidence to the contrary. Accordingly, we agree with the master's ruling.

For the reasons stated, the judgment is reversed as to the determination that Mae can inherit Henry's share, affirmed as to all remaining issues and remanded for entry of an order consistent with this opinion.

Affirmed in part, reversed in part and remanded.

CONNOR and HEARN, JJ., concur.