562 S.E.2d 620

Anne S. PARKER, Petitioner,

v.

Winfield W. SHECUT and Marion A. Shecut, III, Defendants,

of whom Marion A. Shecut, III, is Respondent.

No. 25444.

Supreme Court of South Carolina.

Heard Jan. 10, 2002.
Decided April 15, 2002.

William O. Pressley, Jr., of Perrin, Perrin, Mann & Patterson, LLP, of Spartanburg, for petitioner.

A.F. Carter, III, of Carter Law Firm P.A., of Orangeburg, for respondent.

PLEICONES, Justice:

We granted certiorari to consider the Court of Appeals' decision affirming the Master in Equity's determination that Respondent Marion A. Shecut, III, ("Bo") did not oust his co-tenant, Petitioner Anne S. Parker ("Anne"), from their jointly-owned beach house. *Parker v. Shecut*, 340 S.C. 460, 531 S.E.2d 546 (Ct.App.2000). We reverse and remand.

## FACTS

In October 1992 Mary Shecut died, leaving her estate of approximately $1.3 million dollars to her three children, Anne, Bo, and Defendant Winfield W. Shecut ("Win"). Mary's will named Bo and Win executors of the estate. On April 6, 1993, Anne, Bo, and Win executed a written agreement ("private agreement") delineating how the substantial real property inherited from their mother would be divided. Under the private agreement, Win received the bulk of the family's farm

property adjacent to his own residence, while Anne and Bo received, as tenants in common, some farmland, a beach house at Edisto Island (which is at the heart of the issue on appeal), and a number of commercial properties in Orangeburg County. Anne and Bo agreed to manage their properties together, and each deposited $3,000.00 in a banking account under the name Shecut Investments. The two apparently did not execute a partnership agreement or otherwise reduce their management agreement to writing.

Correspondence in the record suggests problems with the property arrangement between Anne and Bo began by early 1994. On February 15, 1994, Anne wrote Bo a letter offering to sever the co-tenancy in some of their joint property, with each receiving sole ownership of a portion. She complained that some of the property was not "being utilized equally between us."

Despite Anne's complaints, she and Bo maintained the beach house as a rental property through 1995. Anne presented evidence that the beach house generated the following gross rents between 1993 and 1995:

| YEAR | GROSS RECEIPTS |
|------|----------------|
| 1993 | $ 8,497.00 |
| 1994 | $18,181.00 |
| 1995 | $19,841.00 |

According to Bo, however, after taxes, insurances and other expenses, the beach house generated only $229.00 in income in 1995. Bo included this amount on his income taxes for 1995. He testified that he claimed no income for the years 1993 and 1994. A real estate appraiser, called by Anne, testified that the Edisto Island beach house was a break-even rental property. The appraiser added that the best use for the house, that is the most profitable use, was to sell it.

During the years the beach house was rented, Anne took one-half of its depreciation on her income tax returns. In 1995, Anne amended the agreement with Edisto Realty, the real estate company managing the beach house property, and had all rental checks mailed directly to her home in Atlanta.[1] Upon receipt of the rental checks, Anne endorsed them over

---

1. Prior to this time rental checks had been mailed to Bo, payable to Shecut Investments.

to the attorney for the mother's estate. According to Bo, during the year Anne received rental checks, taxes and other expenses on the property were not paid, and Edisto Realty had to pay some of the expenses on the beach house. Bo also testified that he retrieved a check for about $4,000.00 from Edisto Realty in June 1995 and kept the check.

In January 1996 Bo, without consulting Anne, made the beach house his primary residence, and ceased renting the house. Anne testified that Bo told her in March 1996 that she was not welcome to use the beach house. He also told her he changed the locks. Prior to this time, Anne had access to the beach house when it was not being rented.

Bo denied that he ever told Anne she was not welcome at the beach house. He testified she was always welcome as long as "she would behave." Anne testified that she visited the beach house as late as March 1997, and that she entered the house. She added that while there, she was confronted by police. She could not establish that Bo called the police or was in any way responsible for the police showing up at the house.

Anne visited the beach house on one occasion between May 1997 and November 1997 and discovered her keys no longer worked. As of the date of the second hearing, November 12, 1997, Anne no longer had a working key or access to the beach house.

Bo changed the locks after the house was vandalized on June 13, 1997. He admitted that after that date Anne no longer had a working key. Based on a conversation he had with Win, Bo suspected Anne committed the vandalism. Win testified that he had a telephone conversation with Anne wherein she admitted she vandalized the beach house. Anne denied vandalizing the house and maintained that she had not been at the house on or about June 13, 1997.

Following the November 12, 1997, hearing, the master ordered the property granted Anne and Bo in the private agreement divided in-kind, with the exception of the beach house, which he ordered sold at public auction. The proceeds were divided so as to equalize the in-kind distribution.[2] The

---

2. Specifically, the order practically awarded Bo $58,100 more of the proceeds of the beach house sale than Anne, not including attorney's fees.

master found Bo had not committed ouster and awarded Anne no rent for the time Bo was in exclusive possession of the house. The Court of Appeals affirmed, finding that "Anne offer[ed] no evidence of either ouster or exclusion. Accordingly, Bo does not owe Anne anything for his use of the beach house...." *Parker v. Shecut, supra,* at 496, 531 S.E.2d at 566.

## ISSUE

Did the Court of Appeals err in determining Anne had failed to show ouster by Bo?

## ANALYSIS

" 'Ouster' is the actual turning out or keeping excluded a party entitled to possession of any real property." *Freeman v. Freeman,* 323 S.C. 95, 99, 473 S.E.2d 467, 470 (Ct.App.1996). "By actual ouster is not meant a physical eviction, but a possession attended with such circumstances as to evince a claim of exclusive right and title and a denial of the right of the other tenants to participate in the profits." *Woods v. Bivens,* 292 S.C. 76, 80, 354 S.E.2d 909, 912 (1987).

The acts relied upon to establish an ouster must be of an unequivocal nature, and so distinctly hostile to the rights of the other cotenants that the intention to disseize is clear and unmistakable.... Only in rare, extreme cases will the ouster by one cotenant of other cotenants be implied from exclusive possession and dealings with the property, such as collection of rents and improvement of the property.

*Freeman, supra,* at 99, 473 S.E.2d at 470 (citations omitted).

Where one co-tenant has ousted the other co-tenant, and kept them out by force, he is liable as a trespasser for the rental value of the property beyond his ownership share. *Jones v. Massey,* 14 S.C. 292, 307–08 (1880).

We do not agree with the Court of Appeals' conclusion that Anne produced no evidence of ouster or exclusion. In our view, the preponderance of the evidence demonstrates ouster. Bo's own testimony establishes that on or about June 13, 1997, he changed the locks to the beach house. Further, he testified that he had not given Anne a working key, nor did he have any intention of giving Anne a key unless the master

ordered him to do so. Bo's actions in changing the locks and refusing to provide Anne with a key are so distinctly hostile to Anne's rights that Bo's intention to disseize is clear and unmistakable. *See Freeman, supra.* Further, Bo's actions clearly evince his claim of exclusive right and a denial of Anne's right to use the property. *See Woods, supra.* Accordingly, we find that Bo ousted Anne on June 13, 1997.[3]

Because the evidence adduced at trial shows Anne was ousted from the beach house on June 13, 1997, we REVERSE the Court of Appeals' decision on this issue and REMAND to the master for a determination of damages, if any, due Anne from the date of ouster.

We note that neither party appealed that portion of the master's judgment ordering that the beach house be sold. Thus, Anne's appeal did not stay the sale of the house, and it appears the sale should have proceeded. *See* Rule 205, SCACR ("Upon the service of the notice of appeal, the appellate court shall have exclusive jurisdiction over the appeal. . . . Nothing in these Rules shall prohibit the lower court . . . from proceeding with matters not affected by the appeal."). Even had Anne or Bo appealed the sale, judgments directing the sale of real property are not automatically stayed on appeal. *See* Rule 225, SCACR; S.C.Code Ann. § 18–9–170 (1985). However, according to representations made by both parties at oral argument, the beach house has yet to be sold. On remand, the master is to proceed forthwith with the sale of the beach house pursuant to his unappealed order.

TOAL, C.J., MOORE, WALLER and BURNETT, JJ., concur.

---

3. We disagree with the holding implicit in the master's order that because Bo believed Anne vandalized the beach house, he was justified in excluding her from the property. A co-tenant's suspicion that another co-tenant has vandalized jointly-owned property does not permit the suspicious co-tenant to take the law into his own hands and forcibly exclude his co-tenant. If Bo believed his co-tenant Anne wasted the property, he should have sought to enjoin her from doing so, rather than resorting to self-help.