11YELVERTON, Judge.
The issue in this appeal is the correctness of the trial court’s finding that Alana Sud-wiseher (Alana) was not the biological child of the deceased, Paul Hoffpauir. We conclude that the trial judge, who properly applied the clear and convincing bin-den of proof, did not commit manifest error in his findings. Accordingly, we affirm.
J2FACTS
This filiation action has been pending since 1981. Alana sued Hoffpauir’s estate claiming that Hoffpauir was her biological father. He died in 1979 survived by his wife, Rosemary Wright Hoffpauir, whom he had married in 1933. Hoffpauir was also survived by his two legitimate children resulting from his marriage of 46 years: Rosemary Hoffpauir and Paul Hoffpauir, Jr. (Note: Paul Jr. was legally adopted by the couple). Alana was bom in September 1951 and her biological mother was Joyce Moore (Joyce), who subsequently died in 1968. In her petition, Alana claimed that, as the biological child of Hoff-pauir, she is a forced heir and, thus, entitled to share in Hoffpauir’s estate.
Although Alana’s mother was married to Davis Benoit when Alana was conceived and although Benoit is listed as Alana’s father on her birth certificate, Alana nevertheless claimed that Benoit could not be her biological father as he was incarcerated during 1950 and 1951. Instead, her birth in 1951 resulted from an adulterous and secret affair between Joyce and Hoffpauir. Alana further alleged that Hoffpauir visited with her on many occasions and that in 1969 he admitted to her that she was his biological daughter.
To aid in proving the relationship, Alana sought to compel Hoffpauir’s legitimate daughter, Rosemary Hoflpauir, to submit to a blood test since testing of Hoffpauir’s necrotic tissue was not feasible. After the trial court denied Alana’s request for a compelled blood test of Rosemary, the Louisiana Supreme Court granted a writ and held that Rosemary could be compelled to submit blood for DNA comparison with Alana. See Sudwischer v. Estate of Paul Hoffpauir, 589 So.2d 474 (La.1991), cert. denied, 504 U.S. 909, 112 S.Ct. 1937, 118 L.Ed.2d 543 (1992). Thereafter, Dr. James Cohen, Ph.D. conducted the blood testing. He took blood samples from Rosemary and Alana, as well as two of Alana’s siblings, John Benoit and Brenda Lecompte. (Alana and her two siblings, Brenda Lecompte and John Benoit, definitely shared the same biological mother, Joyce. However, it was assumed that they did not share the same biological father; Davis Be-noit was always considered the natural father of Brenda and John, but not of Alana even though he was listed as such on Alana’s birth certificate.) Neither of Alana’s two siblings made any claims that Hoffpauir was their biological father. Their blood was tested solely to determine which genes in Alana were contributed by their common mother and to verify the assumption that Alana did not share the same father with Brenda and John.
In early 1996, fifteen years after Alana filed suit, proceedings to decide filiation finally commenced. Dr. Cohen testified as to the results of DNA blood testing that essentially compared eight different genes of each of the four persons tested. He explained that the test could not answer the central question, which was whether Alana was the biological daughter of Hoffpauir. The test could indicate only if Alana and Rosemary were related. If a relationship was indicated, no one could answer exactly how the parties were related. In other words, even if Alana and Rosemary were somehow related, it would be impossible to conclude that it was due to Hoffpauir as the common father. It was even impossible to scientifically verily that Rosemary, Hoffpauir’s legitimate daughter, was actually his biological daughter since his blood was never tested.
RBased on his “DNA Polymorphism Summary Report,” Dr. Cohen concluded that there was “really a phenomenal amount of *592 matching” between the genes of Alana and Rosemary. Thus, he opined that the test results suggested some type of relationship between Alana and Rosemary. On cross-examination, Dr. Cohen admitted to a surprising result. While the tests indicated a high probability of a relationship between Alana and Rosemary, the results also indicated a high probability of relationship between Rosemary and Alana’s two siblings, Brenda and John. However, neither of these two siblings contended that Hoffpauir was their natural father.
Dr. Herbert Polesky, the expert for the defense, testified as to his interpretation of the test results. He agreed with Dr. Cohen that all four persons tested “share a high probability of having the same genetic background.” Dr. Polesky opined that this genetic matching between Rosemary, Alana, and Alana’s siblings might be explained by some relationship among all four other them Rosemary and Alana sharing a common father. Furthermore, he stated that it is difficult to “interpret this data if there isn’t some other relationship,” besides the common father theory, between Alana and Rosemary.
In addition to the expert testimony, both parties called numerous witnesses to testify as to Hoffpauir’s activities in the early 1950’s when he was alleged to have fathered Alana. The testimony was conflicting. Two of Alana’s aunts, one in court and one by deposition, testified that Hoffpauir essentially lived a double life, visiting Joyce several nights a week for many hours each visit and giving sums of money for support. A friend of Alana’s family, by deposition, corroborated the aunts’ account of the relationship between Hoffpauir and Joyce.
I sin contradiction, defense witnesses testified that Hoffpauir, devoted to his family and his work, was rarely absent from the family home in the evenings and usually had supper with his family. Paul Hoffpauir, Jr., who was 10 years old in 1951, specifically remembered that his dying grandfather lived with the family from late 1950 until his death in late 1951, with hired nurses caring for him during the day. Alana was conceived in early 1951. He testified that Hoffpauir had to be home in the evenings as he was the grandfather’s primary caretaker and the sole person in the household capable of administering injections at night.
A close friend of the Hoffpauir family, who regularly visited with the Hoffpauirs during the 1950’s, testified that it would have been impossible for Hoffpauir, a dedicated rice farmer, to have lived a double life during that period. She related the following:
This man (Hoffpauir) was very ritualistic about his schedule, literally. He was up in the morning at 4:30, came back into town from his farm work early for lunch, worked again, and then was home for supper. You could set your clock by it. It would have been very odd for that not to occur. And to be in bed by 9:00. I didn’t usually call Rosemary after 9:00, for the reason that I would not have wanted to disturb them.
Several other witnesses corroborated this testimony concerning Hoffpauir’s work schedule and his hardworking, no-nonsense attitude toward his farming, leaving little time for a secret life.
Significantly, the defense presented evidence conflicting with Alana’s allegation in her petition that Benoit could not have fathered her because he was incarcerated in 1950 and 1951. Court documents (introduced in evidence at the trial on the merits, after the Supreme Court granted the writ) prove that Benoit was | incarcerated as late as February of 1951, only seven months before Alana’s birth. Thus, Alana’s allegation that Be-noit fathering her was physically impossible was effectively discredited.
Alana testified concerning her relationship with Hoffpauir. She stated that, sometime in 1969, she met with Hoffpauir who informed her that he and Joyce had been lovers and that he was her natural father. There were no witnesses to this alleged meeting; nor can Alana remember the exact date or exact location of this meeting except that it occurred at a motel in Rayne, Louisiana. Alana further testified that, after this initial meeting, she and Hoffpauir met regularly during a two-year period. During this period, they met 15 or 20 times at Hoff-pauir’s family home in the evenings, or they *593 met at Alana’s home almost every morning before Hoffpauir went to his doctor’s office. Alana testified that she last saw Hoffpauir at his family home after he had his stroke and had become bedridden. On that final visit which occurred sometime in the 1970’s, Alana claimed that Hoffpauir’s wife actually let Alana in to visit her bedridden husband. Several of Alana’s relatives testified to isolated instances of seeing Hoffpauir and Alana together and of Alana introducing Hoffpauir to them as her father.
However, members of the Hoffpauir family contradicted portions of Alana’s testimony. Mrs. Hoffpauir flatly denied ever meeting Alana or permitting Alana to visit with her sick husband in their family home. Hoff-pauir’s daughter, Rosemary, stated that during the two-year period when Alana allegedly visited the Hoffpauir family home 15 to 20 times, she was attending high school and living with her parents, and she denied these visits. Rosemary testified that she and her mother 17were rarely absent from the family home in the evenings. Thus, it would have been virtually impossible for Alana to have visited numerous times without detection. Rosemary testified that she never saw Alana at the family home and she did not know of any relationship between Hoffpauir and Alana.
Alana also testified that Hoffpauir often brought her meat and gave her cash. She stated that before his illness he had given her two pictures of himself. Aana introduced two pictures at trial. However, these pictures contained no inscription from Hoff-pauir’s hand, and Alana had no pictures of the two of them together. Nor did she have any mementos or writings from Hoffpauir. Contradicting Alana’s story, Rosemary Hoff-pauir testified that one of the photos introduced by Alana was stolen from the family album after her father’s illness and disability. This photo had marks on the back indicating that it was removed from an album.
The trial judge rendered judgment on June 6,1996, in favor of the Hoffpauir estate and dismissed Alana’s lawsuit. In his written reasons for ruling, the trial judge reviewed the conflicting testimony and concluded as follows:
The court is not convinced that Paul C. Hoffpauir, Sr. continually or habitually acknowledged Alana Sudwischer as his daughter. Furthermore, this petitioner failed to provide evidence that Hoffpauir was generally reputed to be her father.
After reviewing the evidence in this case, the Court finds that although it may be possible that the events occurred as described by the plaintiff, and that it may even be probable, but it certainly was not clearly and convincingly established. Paul C. Hoffpauir, Sr. did not continuously and unequivocally recognize this plaintiff as his own child. Hoffpauir may have led a double life, withholding any knowledge of this illicit relationship and its fruit from all but the closest friends and relations of the plaintiff, but the Court is not firmly convinced of the truth of this assertion.
IsAs to the genetic testing and the expert interpretations, the judge characterized this evidence as “ambiguous at best.”
On appeal, Alana argues that the trial judge committed legal error by applying the clear and convincing standard of proof to her ease; instead the less stringent standard, preponderance of evidence, should have applied. Additionally, she argues that, even if the more stringent burden of proof applied, the trial judge committed manifest error in his finding that Hoffpauir was not Alana’s natural father.
OPINION
Since 1981, when Alana filed her filiation suit, the code article controlling filiation has undergone seyeral revisions. The controlling article, La.Civ.Code art. 209, currently states, in part, as follows:
B. A child not entitled to legitimate filiation nor filiated by the initiative of the parent by legitimation or by acknowledgment under Article 203 must prove filiation as to an alleged deceased 'parent by clear and convincing evidence in a civil proceeding instituted by the child or on his behalf within the time limit provided in this article.
C. The proceeding required by this article must be brought within one year of the *594 death of the alleged parent or within nineteen years of the child’s birth, whichever first occurs. (Emphasis provided) ■
When Alana filed suit in March of 1981, Article 209(5) as it then read, before the 1982 revisions, provided for the following time limitation: “A civil proceeding to establish filiation must be brought within six months after the death of the alleged parent, or within nineteen years of the illegitimate child’s birth, whichever occurs first.” Although Alana technically faded to meet this time limitation (she was |9older than 19 years), she nevertheless filed timely due to the one-year grace period provided by then Section 4 of Act No. 549 of 1980.
The Article 209(B) requirement of proof by “clear and convincing evidence” as to a deceased parent was added in 1982, after Hoff-pauir had died and Alana had filed suit. Prior to this 1982 amendment, Article 209 only required proof by “a preponderance of the evidence” for both a living and a deceased parent. In determining the applicable burden of proof in this case, we must answer two questions. First, does the “clear and convincing” burden of proof have retroactive effect such that it applies to Alana’s suit? Second, if so, does this heightened burden of proof violate the constitutional, equal protection rights of illegitimates seeking filiation with a deceased parent? For the reasons below, we hold that the applicable standard in the case is clear and convincing evidence.
The issue of retroactivity is settled. In Thomas v. Smith, 468 So.2d 971, 975 (La. App. 3 Cir.1985), this court held that the 1982 amendment to Article 209, providing for the “clear and convincing” standard of proof, would be applied retroactively as “it is evi-dentiary and remedial in nature.” See also Succession of Sanders, 485 So.2d 126 (La. App. 2 Cir.), writ denied, 487 So.2d 448 (La.1986), where the second circuit held that the 1982 amendment was retroactive. True, the Louisiana Supreme Court has not directly decided the issue. However, in the present case of Sudwischer, 589 So.2d at 475, when it was before us on writs, the supreme court stated in dictum: “Alana’s statutory burden of proof is ‘clear and convincing evidence.’ This standard of proof is more stringent than the preponderance standard which generally 1 mapplies in civil eases.” We hold that the 1982 amendment to Article 209 applies retroactively, and, hence, Alana’s burden is “clear and convincing evidence.”
Alana argues that, if the more stringent burden of proof does apply, this statutory provision is violative of the equal protection clause and, thus, unconstitutional. She argues that Article 209 impermissibly creates two different classes of illegitimate children seeking filiation: one class of illegitimates, who file filiation suits against a living parent and are held to the less stringent standard of preponderance of evidence, and another class of illegitimates, who seek filiation with a deceased parent and are held to the more stringent standard of clear and convincing evidence. Alana is a member of this latter class, and it is this latter class, Alana argues, whose equal protection rights are violated.
In Succession of Grice, 462 So .2d 131(La.1985), appeal dismissed 473 U.S. 901, 105 S.Ct. 3517, 87 L.Ed.2d 646 (1985), the supreme court addressed whether the time limitation imposed by Article 209(C) was constitutional and held that the limitation did not violate the illegitimate child’s equal protection rights. Although the Grice court did not address specifically the constitutionality of the heightened burden of proof required by paragraph (B) of Article 209, it set forth the equal protection analysis for any claim based on illegitimacy:
The equal protection clause of the fourteenth amendment of the federal constitution and article 1 § 3 of our state constitution provide that no person shall be denied equal protection of the laws. Although classifications based on illegitimacy are not “suspect” or subject to “strict scrutiny” under equal protection analysis, the scrutiny applied to them “is not a toothless one....” Such classifications are | nunconstitutional unless they are substantially related to permissible state interests. (Citations omitted)
Grice, 462 So.2d at 133.
It has long been recognized that the states have a legitimate, permissible interest in *595 safeguarding the just and orderly disposition of succession property as well as avoiding spurious paternity suits and fraudulent claims against estates. Id.; Lalli v. Lalli, 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978); Sanders, 485 So.2d 126. In Lalli the United States Supreme Court decided the constitutionality of a New York statute that allowed an illegitimate child to inherit from the natural father, who died intestate, only if the father’s paternity had previously been declared in a judicial proceeding before that father’s death. The Lalli court held that this “evidentiary” requirement, i.e., a judicial declaration of filiation before the father’s death, was “substantially related” to “important state interests,” i.e., the orderly disposition of succession property and the avoidance of fraudulent claims. Id. Thus, the court concluded that the statute was not violative of equal protection rights. Before reaching its conclusion, the Lalli court discussed in detail the inherent evidentiary problems associated with filiation to the deceased putative father:
As the State’s interests are substantial, we now consider the means adopted by New York to further those interests.
[[Image here]]
Accuracy is enhanced by placing paternity disputes in a judicial forum during the lifetime of the father. As the New York Court of Appeals observed in its first opinion in this case, the “availability [of the putative father] should be a substantial factor contributing to the reliability of the factfinding process.” In re Lalli 38 N.Y.2d [77] at 82, 378 N.Y.S.2d [351] at 355, 340 N.E.2d [721] at 724 [(1975)]. In addition, requiring that the order be issued during the father’s lifetime permits Ii2a man to defend his reputation against “unjust accusations in paternity claims,”....
... [Fraudulent assertions of paternity will be much less likely to succeed, or even to arise, where the proof is put before a court of law at a time when the putative father is available to respond, rather than first brought to light when the distribution of the assets of an estate is in the offing.
Id. at 271-272, 99 S.Ct. at 526.
Like the requirements of the New York statute at issue in Lalli the burden of proof provided by Article 209(B) is an evidentiary requirement and specifically addresses the problem of the deceased putative father and spurious claims.' The legislature obviously enacted this heightened burden of proof because the deceased putative father would not be available to defend himself or to provide valuable evidence. If the New York statute had been applicable to Alana’s claim, she would have been precluded from even filing suit against Hoffpauir’s estate since that statute required judicial proceedings before the father’s death. Yet, the New York statute was held to be constitutional. Our Article 209(B), with a far less demanding burden of proof than the New York statute, should likewise be held constitutionally valid. We conclude that the “clear and convincing” burden of proof required by Article 209(B) is substantially related to the legitimate state interests of ensuring the orderly disposition of succession property and avoiding fraudulent claims. Thus, the statute is not violative of the equal protection clause.
Having decided that the burden of proof is clear and convincing evidence, we now address the remaining issue which is whether the trial judge correctly concluded that Alana failed to prove filiation. The trial judge’s factual findings regarding Alana’s fili-ation with Hoffpauir are subject to the manifest error standard of 113review. D.M.J. v. B.G.B., 576 So.2d 537 (La.App. 4 Cir.1990), writ denied, 578 So.2d 932 (La.1991), cert. denied, 502 U.S. 888, 112 S.Ct. 248, 116 L.Ed.2d 203 (1991). This deferential standard requires that, when the parties have presented conflicting testimony, the appellate court should not disturb the fact finder’s conclusions based on credibility evaluations. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Based on the record, we cannot say that the trial judge committed manifest error. The expert evidence is inconclusive on the issue of Alana’s paternity. We agree with the trial judge that the expert testimony is “ambiguous.” Furthermore, the record is replete with the conflicting testimony regarding the two disputed events, Hoffpauir’s affair with Joyce during the early 1950’s when Alana was conceived, and Alana’s relation *596 ship with Hoffpauir in the late 1960’s and early 1970’s. It was crucial to her case that Alana prove the existence of' these two events. However, in the factual section, we have already detailed the substance of the contradictory testimony and the inconclusive evidence. We are unable to conclude that the trial judge’s factual findings are unreasonable in light of the conflicting testimony.
Because we affirm on the merits it is unnecessary that we address the prescription issue raised by appellees in their protective answer to the appeal.
The judgment is affirmed at appellant’s cost.
AFFIRMED.