531 S.E.2d 546

**Anne S. PARKER, Appellant,**

v.

**Winfield W. SHECUT and Marion A. Shecut, III, Respondents.**

**No. 3167.**

Court of Appeals of South Carolina.

Heard Oct. 6, 1999.

Decided May 22, 2000.

Rehearing Denied July 15, 2000.

462

468

William O. Pressley, Jr., of Perrin, Perrin, Mann & Patterson, of Spartanburg, for appellant.

A.F. Carter, III, of Carter Law Firm, of Orangeburg; and Robert A. McKenzie and Gary H. Johnson, II, both of Mc-Donald, McKenzie, Rubin, Miller & Lybrand, of Columbia, for respondents.

CURETON, Judge:

Anne Shecut Parker sued her brothers, Winfield W. Shecut (Win) and Marion A. Shecut, III (Bo), to partition their mother's estate in accordance with her will rather than a private agreement (Agreement) executed by the siblings after her death. Anne also sought an accounting of estate income. Bo and Win counterclaimed for breach of the Agreement and sought its specific performance along with damages associated with the breach. In bifurcated proceedings, the Master–In–Equity found the Agreement valid and ordered its specific performance as well as awarding damages to Bo and Win. The master also partitioned most of the property which the Agreement conveyed to Anne and Bo jointly. Anne appeals. We affirm in part, reverse in part and remand in part.

## FACTS

Mary Shecut (Mrs. Shecut) died testate on October 30, 1992, leaving a taxable estate of $1,272,280 in equal shares to Win, Bo, and Anne. The bulk of the estate consisted of agricultural and commercial property in Orangeburg County and a beach house on Edisto Island. Mrs. Shecut's will nominated Win and Bo to serve as co-executors of her estate.

Several days after their mother's death, Win and Bo collected her personal property from several lock-boxes which she maintained at different banks. The three siblings divided the contents of the lock-boxes and other personal property among themselves. Anne maintains the siblings planned to have their respective portions appraised to ensure equal distribution. Any difference in value would be evened out with the contents of additional lock-boxes. Win and Bo claim the division was final and denied the existence of additional lock-boxes. Anne's portion included a coin collection which she sold for $11,677, as well as jewelry and sterling silver flatware which she sold for an estimated $7,000 to $9,000. Win did not have his portion appraised, but estimated it was worth be-

tween $2,000 and $4,000. The record does not contain a valuation of Bo's portion.

Anne also received other personal property from the estate including a Cadillac which she sold for $1,400 and furniture from her mother's house which Win stored for safekeeping until Anne could take the furniture to her home in Atlanta. The furniture remained in storage for more than three years until Win transferred the furniture to a barn on his farm.

Several months after their mother's death, the parties began arguing over the distribution of the estate. The first point of contention concerned a house and two acres of land known as Bo's residence. In 1978, Mrs. Shecut transferred the two acre lot to Bo and he built the house on it. Bo later reconveyed the house and lot to his mother because he was having drug and marital problems. Bo continued living in the house and treating it as his own after the reconveyance. Win thought the house should be included in the estate, but Anne and Bo thought it should be excluded.

The other major point of contention between the parties involved the distribution of specific estate assets. Win, a farmer, sought certain farmland and agricultural equipment from the estate which he had used in his farming operations prior to his mother's death. He also wanted his share of the estate severed from that of Anne's and Bo's to distance himself from the various disputes raging between the parties. Anne and Bo were both interested in the estate's commercial property and the beach house. The three siblings agreed that Win would receive the property he sought while Anne and Bo would jointly receive the remainder of the estate. To manage their joint properties and the income they produced, Anne and Bo formed a parol partnership called Shecut Investments.[1] The parties instructed the estate's attorney, Carole H. Gunter, to prepare an Agreement which effectuated their desires. The parties executed the Agreement on April 6, 1993. Win

---

1. At the beginning of the partnership, Bo collected all the rents generated by the joint property and arranged for its upkeep and maintenance. He testified that he would not deposit cash-rents into the partnership's bank account, as he did with noncash-rents, but that he kept half of the cash for himself and paid the other half to Anne when he next saw her. Anne claims she never received any money from Bo. At trial, Bo admitted he still possessed some undistributed cash-rents for Anne.

received a house in Orangeburg, several tracts of farmland, and a portion of a tract of farmland known as the Cope property. Win's portion of the Cope property was delineated by an orange line drawn on an aerial photograph. The photograph was attached to the Agreement. Anne and Bo jointly received the remaining farmland, commercial property, a lot in Live Oak subdivision, a mortgage on 11.87 acres owned by Calhoun Construction Company, and the beach house. Bo also received sole ownership of his residence and its appurtenant two acres, but he was required to reimburse his siblings for any estate taxes generated by his residence. Any estate assets not covered by the Agreement were to be distributed equally among the parties after the estate's expenses and taxes were paid. Additionally, Win and Bo were to receive $7,500 each for serving as personal representatives.

After the Agreement was executed, each party treated his or her allotted property and any associated income as their own and continued to do so until Anne filed this action in August, 1995. Win farmed and operated property he received to the exclusion of Anne and Bo. Likewise, Anne and Bo managed their properties through Shecut Investments to Win's exclusion. Trouble arose shortly after the Agreement was executed when Win realized three pieces of farming equipment, which he believed the parties had agreed to allot to him, were omitted from the Agreement. Win raised the omission with his siblings and became angry at their failure to quickly remedy it. Anne claimed Win threatened to repudiate the Agreement unless he was given the equipment and an additional $20,000. Win denied the allegation.

In a letter to Win dated June 20, 1993, Anne acknowledged she and Bo had agreed to allot the omitted farm equipment to him and indicated they would both sign an addendum to the Agreement correcting this omission. The estate's attorney prepared an Addendum which was signed by all parties.[2] The Addendum allotted the farm equipment to Win, gave Bo a

---

2. Anne executed the Addendum on August 4, 1993. Bo's signature on the Addendum is not dated. Win's signature on the Addendum is dated "the 27 day of _____, 1995." Ms. Gunter, who witnessed Win's signature on the Addendum, could not positively state what month Win signed the Addendum, but her records indicated he had visited her office on January 27, 1995.

share of stock in the Orangeburg Country Club and stated that "[t]he parties hereto reaffirm the Private Agreement which they signed on April 6, 1993. They agree to carry out all provisions of that agreement." ·

To effectuate the Agreement and the Addendum, the parties asked their cousin, attorney Charles Williams, to prepare the necessary deeds. Attorney Edgar W. Dickson, who practices law with Williams, attempted to transfer the estate's property pursuant to the Agreement by preparing two sets of deeds. The first set contained Deeds of Distribution which transferred the estate's property to the parties in equal shares pursuant to Mrs. Shecut's will. The second set partitioned the parties' interests in the property according to the Agreement. Dickson testified he believed such a two-step process was necessary to establish a chain-of-title from the estate to the parties. On December 29, 1994, Win and Bo executed the Deeds of Distribution in their capacity as personal representatives of their mother's estate and recorded them in the RMC office for Orangeburg County. At the same time, Bo and Win signed the appropriate partitioning deeds in their individual capacities to fulfill their obligations under the Agreement. Dickson mailed Anne the partitioning deeds and scheduled a closing for March 16, 1995, to complete the second step of the process. At the closing, Bo planned to reimburse his siblings for the estate tax related to his residence by obtaining a loan from Edisto Farm Credit. The partitioning deeds would be finalized at the closing. In a series of letters dated between December 31, 1994 and March 27, 1995, Anne refused to sign the partitioning deeds unless she received an accounting for income produced by estate assets. She particularly objected to Bo's management of their joint properties and his failure to account for the activities of Shecut Investments.

Anne brought this action on August 4, 1995. On the same day, she filed a lis pendens on all of the estate properties, including Bo's house and the property Win received under the Agreement. Anne also filed an accounting action in the Orangeburg probate court. Win counterclaimed for breach of contract.

The Master–in–Equity determined the success or failure of Anne's partition action turned upon the validity of the Agree-

ment. After a four day hearing in May of 1997, the master found the Agreement valid and ordered its specific performance. The master also granted Win's counterclaim for breach of contract, finding Anne breached the Agreement by filing the lis pendens which prevented Win from receiving the full benefit of properties allotted him by the Agreement. Specifically, the master found Win had suffered "consequential actual damages" in the amount of $30,377 because the lis pendens prevented him from receiving a crop subsidy on his farm and also prevented him from selling timber from that land at an above-market price. Additionally, Win incurred the expense of storing Anne's furniture. The master also ordered Anne to pay Win's attorney fees but declined to sanction her under the South Carolina Frivolous Civil Proceedings Sanctions Act. Anne immediately appealed this order, but this Court held the appeal in abeyance until the master could rule on the remaining issues.

The master conducted a second hearing on November 12, 1997 to partition the joint properties of Anne and Bo and to consider an accounting for income generated from the joint properties. By order dated February 17, 1998, the master allotted the commercial property in Orangeburg and the property in Branchville to Anne. He allotted the Norway property, the remaining portion of the Cope property, a lot in Country Oaks Subdivision and the Calhoun Construction mortgage to Bo. He also allotted Bo $58,000 from the sale of the beach house to make up for the difference in the in-kind distribution.

The master conducted an accounting of the activities of Shecut Investments. He found Bo had settled with Anne for all of Shecut Investment's cash receipts through December, 1994, with a cashier's check for $4,750. He ordered Bo to pay Anne $3,837.13 for rents owed to her. He also ordered rents collected by Ms. Gunter on behalf of Anne and Bo be divided equally after Anne was reimbursed for her half of the rent she collected and deposited with Ms. Gunter. The master found that prior to May 17, 1997, both parties had access to the beach house as tenants-in-common. He found that Anne had vandalized the beach house after the first hearing, thereby justifying Bo's decision to change the locks to protect the property from Anne. In addition, the master found the beach

house produced little or no income so Anne and Bo did not owe each other rent.

The master held Bo had missed a favorable business opportunity due to the lis pendens being filed against his house. He also concluded that a resulting or constructive trust was created between Mrs. Shecut and Bo in regards to the house. He held Bo sustained "consequential actual damages" in the sum of $30,000. He declined to award Bo damages for slander of title, finding such an award would result in double recovery. The master ordered a judicial sale of the beach house with a minimum bid of $400,000. He awarded Win $23,699.37 in attorney fees to be paid from Anne's net proceeds of the sale. The master awarded Bo $25,423.11 in attorney fees from the proceeds of the sale. The master reduced the amount of fees requested by Anne and awarded her attorney $45,786.79 to be paid from the net proceeds of the sale. Bo and Anne were to equally divide the remaining proceeds.

## LAW/ANALYSIS

### *Standard of Review*

An action for specific performance lies in equity. *Collier v. Green*, 244 S.C. 367, 137 S.E.2d 277 (1964). Additionally, partition actions and accountings are also equitable in nature. *Wilson v. McGuire*, 320 S.C. 137, 463 S.E.2d 614 (Ct.App.1995). When reviewing an equitable action, this Court may find facts in accordance with our own view of the preponderance of the evidence. *Townes Assocs. v. City of Greenville*, 266 S.C. 81, 221 S.E.2d 773 (1976). This broad scope of review does not mandate that we disregard the findings of the master who saw and heard the witnesses and was in a better position to judge their credibility. *Tiger, Inc. v. Fisher Agro, Inc.*, 301 S.C. 229, 391 S.E.2d 538 (1989). Actions for breach of contract are legal. *Shaw v. Atlantic Coast Life Ins. Co.*, 322 S.C. 139, 470 S.E.2d 382 (Ct.App. 1996). When legal and equitable causes of action are maintained in one suit, each retains its own identity as legal or equitable. *Future Group, II v. Nationsbank*, 324 S.C. 89, 478 S.E.2d 45 (1996).

Although Anne couches the majority of her arguments as errors of the master in ordering specific performance of the

private Agreement, the gravamen of this appeal concerns the validity of the Agreement. We therefore separate Anne's arguments into those which challenge the Agreement's validity and those which challenge the propriety of ordering its specific performance.

## I. *Validity of the April 6ᵗʰ Agreement*

### A. *Abandonment of Agreement*

■ Anne argues Bo and Win either breached or abandoned the Agreement by executing the Deeds of Distribution because the deeds made no mention of the Agreement. Alternatively, Anne argues the deeds are conclusive evidence that the siblings hold the entire estate as tenants-in-common pursuant to S.C.Code Ann. § 62–3–908 (Supp.1997) which states, in pertinent part, that "a deed of distribution from a personal representative is conclusive evidence that the distributee has succeeded to the interest of the Estate in the distributed assets...." The master held the execution of the deeds was a "ministerial act" to effectuate the Agreement. We agree with the master's interpretation.

A party to a contract breaches it by "fail[ing] to carry out [a] term, promise, or condition of the contract." Blacks Law Dictionary 130 (6ᵗʰ ed. abr. 1995); *see also Freeman Dodge, Inc. v. MCC Fin. Servs., Inc.,* 272 S.C. 164, 249 S.E.2d 897 (1978). Here, Bo and Win, acting in their capacity as personal representatives, executed the Deeds of Distribution upon the advice of Dickson as the first step in a two-step process to implement the Agreement. Dickson testified he believed such a process was necessary to ensure a clear chain-of-title from the estate to the siblings. In the first step, the personal representatives would pass title to the heirs through the Deeds of Distribution. Next, the heirs would divide their interests among each other with the partitioning deeds. Although we express no opinion as to whether such a process is necessary for a proper chain-of-title under similar circumstances, the actions of Bo and Win were not intended to and do not constitute a breach of the Agreement.

■ A party to a contract abandons it by undertaking a positive and unequivocal act which is inconsistent with the existence of the contract. *Ro–Lo Enters. v. Hicks Enters.,*

294 S.C. 111, 362 S.E.2d 888 (Ct.App.1987). "The abandonment of a contract is a matter of intention to be ascertained from the facts and circumstances surrounding the transaction from which the abandonment is claimed to have resulted." *Quality Concrete Prods., Inc. v. Thomason,* 253 S.C. 579, 589, 172 S.E.2d 297, 302 (1970). Bo and Win both testified they executed the deeds to effectuate, not abandon, the Agreement. Similarly, Dickson testified he was retained to transfer the real estate to the siblings in accordance with the Agreement. Such actions do not constitute an abandonment of the Agreement.

### B. Merger By Deed

Anne argues the Agreement merged into the Deeds of Distribution thereby extinguishing the Agreement pursuant to the doctrine of merger by deed. This argument is not preserved for appeal as the master refused to allow Anne to raise the issue of merger at trial and Anne failed to challenge his ruling by an appropriate post-trial motion. It is axiomatic that an issue must be raised to and ruled upon by the trial court before the issue is preserved for appellate review. *Medical Soc'y of South Carolina v. Medical Univ. of South Carolina,* 334 S.C. 270, 513 S.E.2d 352 (1999); *McDavid v. McDavid,* 333 S.C. 490, 511 S.E.2d 365 (1999).

Anne concedes the master rejected her attempt to amend her complaint to add a merger claim, but argues the issue is preserved because the master allowed the issue to be argued at a summary judgment hearing and ruled on the issue in his July 10, 1997 order by declaring it was "not [a] meritorious defense...." Read in context, the master's comment is merely a justification of his denial of Anne's summary judgment motion rather than a specific ruling on the merger issue. However, even if we viewed the comment as a ruling, it would directly conflict with the master's clear ruling in the same order that the issue was not properly raised. When an order is internally inconsistent, that inconsistency must be raised to the trial court by way of a post-trial motion before it is preserved for appellate review. *Grant v. South Carolina Coastal Council,* 319 S.C. 348, 461 S.E.2d 388 (1995); *Revis v. Barrett,* 321 S.C. 206, 467 S.E.2d 460 (Ct.App.1996). Accordingly, the issue of merger by deed is not before this Court.

In any event, Anne's merger claim is without merit. The "conclusive evidence" provision of S.C.Code Ann. § 62–3–908 (Supp.1999) is only applicable to parties who are claiming an interest in an estate asset from the personal representative, not to competent successors who enter into a contract pursuant to S.C.Code Ann. § 62–3–912 (Supp.1999) to alter that which they are entitled to from an estate. Moreover, it is clear that the parties did not intend a merger. *See Hughes v. Greenville Country Club*, 283 S.C. 448, 322 S.E.2d 827 (Ct. App.1984) (recognizing the contrary intent exception to the merger doctrine).

### C. Repudiation of the Agreement

Anne argues Win repudiated the Agreement and failed to withdraw the repudiation by executing the Addendum in a timely manner.[3] We disagree.

A nonbreaching party may repudiate a contract in response to a breach which is "so fundamental and substantial as to defeat the purpose of the contract." *Ackerman v. McMillan*, 314 S.C. 268, 271, 442 S.E.2d 618, 620 (Ct.App.1994). However, the party who repudiated the contract may withdraw the repudiation at anytime before his performance is due provided the other party has neither acknowledged the repudiation nor acted in reliance upon it. 17A Am.Jur.2d *Contracts* § 704 (1991).

Win became dissatisfied with the Agreement after it was executed because it excluded three pieces of farming equipment he believed the parties agreed he would own. He informed the estate's attorney of his "misgivings" and that he "almost immediately regretted signing the document" because of the excluded equipment. Anne responded to Win's misgivings in a letter dated June 20, 1993, by acknowledging the siblings had agreed the equipment would go to Win and offering to sign an addendum to rectify the omission. Eventually, each party signed the addendum which reaffirmed the Agreement. Although Win was dissatisfied with the omission,

---

3. Anne also attempts to characterize the Addendum as a novation, but a novation substitutes a new obligation for an old one which is extinguished. *Wayne Dalton Corp. v. Acme Doors, Inc.*, 302 S.C. 93, 394 S.E.2d 5 (Ct.App.1990). Here, the Addendum modified the Agreement; it did not extinguish it.

he continued to honor the Agreement's property division as did the other parties. Accordingly, Win's repudiation of the Agreement, if any, was withdrawn before any prejudice resulted.

## II. *Specific Performance of the Agreement*

### A. *Fraudulent Inducement*

Anne argues the master erred in granting specific performance of the Agreement because Bo and Win fraudulently induced her to sign the Agreement. We disagree.

The proponent of a claim of fraud in the inducement to enter into a contract must demonstrate: (1) a representation, (2) its falsity, (3) its materiality, (4) knowledge of its falsity or reckless disregard of its truth or falsity, (5) intent that the representation be acted upon, (6) the hearer's ignorance of its falsity, (7) the hearer's reliance on its truth, (8) the hearer's right to rely thereon, and (9) the hearer's consequent and proximate injury. *M.B. Kahn Const. Co. v. South Carolina Nat. Bank of Charleston*, 275 S.C. 381, 271 S.E.2d 414 (1980); *Sorin Equip. Co. v. The Firm, Inc.*, 323 S.C. 359, 474 S.E.2d 819 (Ct.App.1996). The failure to prove any one of these elements is fatal to the claim. *Sorin*, 323 S.C. 359, 474 S.E.2d 819. Generally, the representation must relate to a present or pre-existing fact rather than a statement of future events or an unfulfilled promise. *Woodward v. Todd*, 270 S.C. 82, 240 S.E.2d 641 (1978). An exception to the general rule is recognized for unfulfilled promises which were made by a party who never intended to fulfill the promise and only made it to induce the performance of another party. *Davis v. Upton*, 250 S.C. 288, 157 S.E.2d 567 (1967); *Winburn v. Insurance Co. of North America*, 287 S.C. 435, 339 S.E.2d 142 (Ct.App.1985).

While acting as personal representatives of Mrs. Shecut's estate, Bo and Win made two loans from the estate funds. The first loan, for $20,000, was made sometime in February of 1993 to Win for agricultural expenses. Win shortly repaid the loan with interest. Around the same time, the brothers made a second loan of $5,000 to a family friend, Fletcher Riley. Mr. Riley did not fully repay the loan, but Bo

and Win reimbursed the estate for the shortfall by relinquishing their personal representative fee. However, no interest was ever collected on the Riley loan.[4] Upon discovering the loans, the estate's attorney recommended against future loans although she did not believe such loans were prohibited by Mrs. Shecut's will. Bo and Win complied with the attorney's advice. Anne entered into the Agreement after learning of the loans.

On appeal, Anne fails to enumerate or argue the elements of fraudulent inducement, but merely raises it as an issue. By failing to argue the merits of fraudulent inducement, Anne has lost her right to raise the issue on appeal. *See* Rule 209(D), SCACR (requiring an appellant to set forth an issue in its brief then discuss it with citations to authority); *State v. Cutro,* 332 S.C. 100, 504 S.E.2d 324 (1998) (holding a conclusory argument is insufficient to present an issue on appeal). In any event, there is no merit to Anne's claim that she would not have entered into the Agreement had she known of the loans because the record reveals she did know of them when she entered into the agreement.

Additionally, Anne attempts to prove her fraudulent inducement claim by arguing Bo and Win violated their fiduciary duties as personal representatives by making loans and failing to collect rents due the estate before execution of the Agreement.[5] Anne contends these breaches of fiduciary duty fraudulently induced her to join the Agreement. A personal representative is a fiduciary and as such must act in accordance with the standard of care of a trustee set forth in S.C.Code Ann. §§ 62–7–302 and 62–3–703 (Supp.1998). Where there is a duty to speak, a fiduciary's non-disclosure may be fraudulent. *Cf. Manning v. Dial,* 271 S.C. 79, 245 S.E.2d 120 (1978). However, as discussed above, the loans were disclosed to Anne and therefore could not amount to fraud. Accordingly, we find no fraud in the inducement.

---

4. Whether or not Bo and Win should pay the estate interest on this loan is a matter for the Probate Court. In fact, the master precluded Anne's counsel from raising the issue because the attempt was untimely.

5. The record does not support the allegation that uncollected rents existed before the Agreement was executed.

### B. Satisfaction of Conditions Precedent

Anne argues the master erred in granting specific performance of the Agreement without also requiring Bo and Win to fulfill certain conditions precedent. Specifically, Anne maintains that the collection of all loans and rents due the estate as well as the distribution of all remaining personal property to the siblings are conditions precedent to her obligation to perform under the Agreement. We disagree.

A condition precedent is "any fact ... which, unless excused, must exist or occur before a duty of immediate performance arises." *Worley v. Yarborough Ford, Inc.*, 317 S.C. 206, 210, 452 S.E.2d 622, 624 (Ct.App.1994). The existence of a condition precedent in a contract is a "question of construction dependent on the intent of the parties to be gathered from the language they employ." *Id.* (*quoting Ballenger Corp. v. City of Columbia*, 286 S.C. 1, 5, 331 S.E.2d 365, 368 (Ct.App.1985)). Under certain circumstances, a court may imply a condition precedent to an agreement, but one "may not be implied when it might have been provided for by the express agreement." *Id.* at 210, 452 S.E.2d at 625 (*quoting* 17A C.J.S. *Contracts* § 338 (1963)).

The Agreement did not establish any conditions precedent, but provided that "[a]ny other property remaining in the estate after the payment of creditors, administrative expenses, and debts shall be distributed" in equal shares to the siblings. The payment of an estate's debts, creditors and expenses necessarily comes at the end of probate so it is clear the parties did not intend for the division of the remaining estate assets to be a condition precedent of the Agreement. Furthermore, Anne knew the estate contained rent-generating property. In fact, she and Bo craved that property and negotiated for it in the Agreement so they could manage it as a business. To that end, they formed and operated Shecut Investments. Had Anne intended a full accounting to precede the execution of the Agreement, she could have insisted on such a provision being included in the Agreement. Anne cannot now ask this Court to impose a condition on appeal which was not included in the original agreement. *Worley*, 317 S.C. 206, 452 S.E.2d 622.

■ With the exception of the loans made by the personal representatives, the conditions precedent advocated by Anne were easily within the contemplation of the parties when they executed the Agreement and could have been included in it. Therefore, we will not imply them now. *Id.* As for the loans made by the personal representatives, they were both repaid before the master ordered specific performance so Anne's contention that their repayment was a condition precedent is moot.

■ Even if we were to imply the conditions advocated by Anne, these conditions were either satisfied before Bo and Win attempted to execute the Agreement or are invalid. First, Anne speculates her mother loaned her brothers money which must be repaid to the estate before the Agreement may be performed. However, Anne testified Mrs. Shecut did not require "loans" to her children be repaid. In fact, Anne admitted she was the beneficiary of her mother's largess with a $14,000 loan which Anne did not have to repay. Next, Anne argues that all of the estate's personal property must be distributed before the Agreement can be performed, but the record suggests a full distribution occurred long before the master's order. The record does not support Anne's allegations of undistributed personal property including a "large and valuable coin collection", an "enormous gun" collection, a "room full of silver," and "fishing tackle in the beach house."

■ The last condition precedent advocated by Anne, an accounting of rents generated by the estate prior to the execution of the Agreement, was rejected by the master because an "accounting for pre-[Agreement] rents [should] be heard by the Orangeburg County Probate Court." The master correctly refrained from conducting such an accounting because it falls within the jurisdiction of the probate court. The probate court has exclusive jurisdiction over the administration of an estate. S.C.Code Ann. § 62–1–302 (Supp.1999). Accordingly, we find no error.

## C. *Unclean Hands and Laches*

Anne argues the master erred in granting specific performance of the Agreement due to the doctrines of unclean hands and laches. Neither argument is properly before this Court.

■ The doctrine of unclean hands was enumerated in the caption of her argument, but not specifically argued in her brief. An issue which is raised, but not argued in the appellant's brief is deemed abandoned and will not be considered on appeal. *Taylor v. Medenica,* 331 S.C. 575, 503 S.E.2d 458 (1998). Accordingly, the issue is abandoned.

■ In any event, Anne's assertion of the doctrine of unclean hands is without merit. A defendant seeking the protection of the doctrine of unclean hands must demonstrate that the plaintiff "acted unfairly in a matter that is the subject of the litigation to the prejudice of the defendant." *Wilson v. Landstrom,* 281 S.C. 260, 266, 315 S.E.2d 130, 134 (Ct.App. 1984) (citing *Arnold v. City of Spartanburg,* 201 S.C. 523, 23 S.E.2d 735 (1943)). Here, Anne has failed to demonstrate she was prejudiced by the actions of her brothers. The loans she complains of have been repaid; an accounting of all post-Agreement rents from estate assets has occurred; and a pre-Agreement accounting will be conducted by the probate court. Moreover, any problem associated with the delay in closing Mrs. Shecut's estate is of Anne's own making since she filed the litigation which has needlessly delayed that closing. A defendant may not raise delay of performance as a defense where the defendant is responsible for the delay. *Shannon v. Freeman,* 117 S.C. 480, 109 S.E. 406 (1921).

■ Anne moved to amend her reply to Win's counterclaim to raise the doctrine of laches. The master denied the motion as untimely. Anne never renewed the motion. Therefore, this argument is not preserved for appeal. It is axiomatic that an issue must be raised to and ruled upon by the trial court before the issue is preserved for appellate review. *Medical Soc'y of South Carolina,* 334 S.C. 270, 513 S.E.2d 352; *McDavid v. McDavid,* 333 S.C. 490, 511 S.E.2d 365 (1999). The aforementioned rule applies with equal force to actions before masters-in-equity. *Life of Georgia Ins. Co. v. Bolton,* 333 S.C. 406, 509 S.E.2d 488 (Ct.App.1998); *Global Protection Corp. v. Halbersberg,* 332 S.C. 149, 503 S.E.2d 483 (Ct.App. 1998). Accordingly, the issue is not preserved for appeal.

■ In any event, Anne's claim of laches is without merit. A party seeking the protection of the doctrine of laches must prove the proponent of an action unreasonably

delayed instituting the action and that such a delay is unexplainable and negligent in light of what should have been done. *Lindler v. Adcock*, 250 S.C. 383, 158 S.E.2d 192 (1967). Here, Anne has failed to prove her brothers unreasonably delayed seeking the performance of the Agreement. After the dispute over the omitted farm equipment was resolved, the parties arranged for the preparation of the necessary documents to effectuate the Agreement. Those documents were ready in December of 1994 and a closing was scheduled for March of 1995. This time frame is reasonable given the complexity of the estate as well as the relationship and geographic dispersion of the parties. Accordingly, the issue is without merit.

### D. Jurisdiction Over Bo's Residence

Anne argues the master lacked jurisdiction to determine whether the estate held Bo's residence in an implied trust.[6] We agree.

The probate court has exclusive original jurisdiction over all matters related to estates, including trusts, under most circumstances. S.C.Code Ann. § 62–1–302 (Supp.1999). However, a party to a probate action may remove an action concerning a trust to the circuit court by filing a motion with the probate court "not later than ten days following the date on which all responsive pleading must be filed...." S.C.Code Ann. § 62–1–302(c)(4) (Supp.1999). Here, there is no indication in the record that such a motion was made, so the master's conclusion "that a resulting trust or constructive trust was created between" Mrs. Shecut and Bo was an error.

Although the master erred in deciding whether the estate held Bo's residence in an implied trust, the error does not impact the validity of the Agreement. Bo transferred title to the contested property to his mother for safekeeping because he was having drug and marital problems. Mrs. Shecut gave no consideration for the title and Bo continued to live on the property and pay its mortgage, taxes and insurance premi-

---

6. In the caption to this argument, Anne raised the doctrine of secret trusts, but did not argue it in the body of her brief. An issue raised on appeal, but not argued in the brief is abandoned and will not be considered on appeal. *Taylor*, 331 S.C. 575, 503 S.E.2d 458. Accordingly, the issue is abandoned.

ums. The Agreement gave the property to Bo, but required him to repay Anne and Win for any estate taxes they incurred due to the property being in the estate. The master effectuated the Agreement by giving the property to Bo and holding him accountable for the taxes. His ruling concerning an implied trust merely reflected the conclusion reached by the parties in the Agreement.[7] Accordingly, the master's decision is affirmed.

### E. Description of Cope Property

Anne argues the master erred in ordering the specific performance of the Agreement because it lacked an adequate legal description of the division of the Cope property as required by the statute of frauds and other equitable principles. We disagree.

The Agreement divided the Cope property into two segments: one for Win (Win's Portion) and the other for Anne and Bo jointly (Joint Portion). Additionally, the Agreement specified that a pond located on the Cope Property would be maintained for the "mutual use and enjoyment of all parties of this [A]greement." The division was memorialized with a hand-drawn line on an aerial photograph of the property which was attached to the Agreement. The parties decided to have the property surveyed to officially delineate each portion. Bo and Win arranged for Donald J. Smith, Jr. to prepare the survey. Smith testified he surveyed the Cope property based on the oral statements of Win and an aerial photograph of the property provided by Win. However, the photograph provided by Win was not the same photograph that was attached to the Agreement. Because Smith did not prepare his survey from the photograph attached to the Agreement, the master excluded Smith's survey. When partitioning the joint property of Anne and Bo, the master awarded the Joint Portion to Bo. The master indicated that if Bo and Win could not mutually agree to a division of the Cope property, Bo would have to pay for another survey of the property using the photograph attached to the Agreement.[8]

---

7. Regardless of the claim of a trust relationship, the parties were free to contract for title to be awarded to Bo.

8. Smith testified that an accurate survey could be prepared from the Agreement's aerial photograph.

Anne contends the division of the Cope property by the aerial photograph violates the statute of frauds; however, she did not properly raise this contention to the master. Affirmative defenses, such as the statute of frauds, must be set forth in a responsive pleading. Rule 8(c), SCRCP; *Tupper v. Dorchester County*, 326 S.C. 318, 487 S.E.2d 187 (1997); *American Wholesale Corp. v. Mauldin*, 128 S.C. 241, 122 S.E. 576 (1924); *cf. Resolution Trust Corp. v. Eagle Lake and Golf Condominiums*, 310 S.C. 473, 427 S.E.2d 646 (1993) (expressing the court's distaste for raising unpled issues orally at a summary judgment hearing). Here, Anne failed to raise the statute of frauds as a defense in any of her pleadings. Even if she had properly raised the defense, it is without merit because Anne waived the protection of the statute of frauds by using the aerial photograph to divide the Cope property when she entered into the Agreement and acted in reliance upon that division after the Agreement was in place. "[T]he protection afforded by the statute [of frauds] is a personal privilege of the parties to the agreement, and may be waived by them...." *Walker v. Preacher*, 188 S.C. 431, 436, 199 S.E. 675, 677 (1938); *see also Cooper v. A.A.A. Highway Exp., Inc.*, 206 S.C. 372, 34 S.E.2d 589 (1945).

Nevertheless, we are concerned that the division ordered by the master deprives Anne of her agreed interest in the pond which is located on this property and whose value does not appear to have been considered by the master. We therefore remand to the trial court for a determination of this issue.

### F. Bo's Financial Status

Anne argues the master erred in ordering the specific performance of the Agreement because Bo was financially unable to perform his obligations under the Agreement. This argument is not preserved for appellate review as it was not ruled on by the trial court. *SSI Medical Services, Inc. v. Cox*, 301 S.C. 493, 392 S.E.2d 789 (1990). In any event, the issue is without merit because Bo's only financial obligation under the Agreement was to reimburse Anne and Win "for any estate tax which was caused by the inclusion of [Bo's Residence] in the estate...." Bo arranged to fulfill that obligation with a loan from Edisto Farm Credit and stood ready to tender the

necessary funds at the closing which never occurred due to Anne's refusal to fulfill her obligations.

### III. *Contract Damages*

A breach of contract action seeking money damages is an action at law. *Moore v. Crowley & Assoc., Inc.,* 254 S.C. 170, 174 S.E.2d 340 (1970). "In an action at law, on appeal of a case tried without a jury, the findings of fact of the [trial] judge will not be disturbed upon appeal unless found to be without evidence which reasonably supports the judge's findings." *Townes Assoc., Ltd. v. City of Greenville,* 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976).

#### A. *Lost Profits from Timber Sales*

Anne argues the master erred in ordering her to pay $30,377 in damages to Win for her breach of the Agreement. We agree the master erred in awarding damages for the profits lost in timber sales.

"Damages recoverable for breach of contract either must flow as a natural consequence of the breach or must have been reasonably within the parties' contemplation at the time of the contract." *Manning v. City of Columbia,* 297 S.C. 451, 455, 377 S.E.2d 335, 337 (1989) (citing *Kline Iron & Steel Co. v. Superior Trucking Co.,* 261 S.C. 542, 201 S.E.2d 388 (1973)). Damages arising from unusual circumstances are considered within the reasonable contemplation of the parties where "the defendant was clearly warned of the probable existence of unusual circumstances or ... had 'reason to foresee the probable existence of such circumstances.'" *Stern & Stern Assocs. v. Timmons,* 310 S.C. 250, 251, 423 S.E.2d 124, 125 (1992) (quoting 5 Arthur L. Corbin, *Corbin on Contracts* § 1011 (1964)).

Here, the record contains evidence to support the master's damage awards except as to the timber sales. The parties entered into the Agreement to divide the estate's income producing assets. Win, a farmer, received most of the estate's farmland and equipment. Anne and Bo received most of the estate's commercial property and the beach house. After executing the Agreement, each party treated their allotted properties and their associated income as their own. Anne

and Bo soon began to bicker over the income from their joint properties. Anne breached the Agreement shortly before a closing which would have finalized it. Then, she deliberately deprived Win of the income generated by crop subsidies from the property allotted him by the Agreement. Although her primary motivation for breaching the Agreement was her dissatisfaction with Bo, Anne involved Win in the action also.

As for Win's inability to sell timber from the land allocated to him under the Agreement, it is clear that the lis pendens would have prevented Win from selling or mortgaging his equitable interest in the properties. However, it is not clear that under South Carolina law the lis pendens prevented Win from harvesting the timber and selling it provided he properly accounted for the proceeds.[9] *See Tedder v. Tedder*, 123 S.C. 346, 116 S.E. 436 (1923) (In a partition proceeding, the filing of a lis pendens does not create a lien against rents on the profits of a cotenant's share.). Moreover, there is no indication that Win made any effort to seek an agreement with his siblings to cut the timber and place some portion of the income therefrom in escrow. Under these facts, Win's damages are too speculative to support the master's award. *South Carolina Fin. Corp. v. West Side Fin. Co.*, 236 S.C. 109, 113 S.E.2d 329 (1960) (Profits that have been prevented or lost as a natural consequence of breach of contract are recoverable as an item of damages, but to warrant recovery, lost profits must be established with reasonable certainty and recovery cannot be had for profits that are speculative.). We therefore reverse the master's award of $25,000 for the loss of timber sales.

### B. Win's Failure to Mitigate Damages

 Anne argues the master erred in ordering her to pay Win damages because Win failed to mitigate his damages by

---

9. Additionally, the master's findings are not supported by the evidence. Win testified that Union Camp ran "slap out" of wood during the winter of 1994–95 and it was willing to pay $80 per cord for pulpwood. At the time of the hearing, pulpwood brought $55 per cord; therefore the master found Win lost a $25 per cord premium. Win further testified that Anne's lis pendens, filed in August of 1995, prevented him from taking advantage of the premium. However, there is nothing in the record to suggest that the premium offered in the winter of 1994–95 was still available the following summer; therefore, the master's conclusion concerning the premium is not supported by the evidence.

collecting crop subsidies of properties allotted to him in the Agreement. We disagree.

An injured party is required to do that which an ordinary prudent person would do under similar circumstances to mitigate his damages. *Du Bose v. Bultman,* 215 S.C. 468, 56 S.E.2d 95 (1949); *Genovese v. Bergeron,* 327 S.C. 567, 490 S.E.2d 608 (Ct.App.1997); *Chastain v. Owens Carolina, Inc.,* 310 S.C. 417, 426 S.E.2d 834 (Ct.App.1993). However, the injured party is not required to unreasonably exert himself or incur substantial expense in an effort to mitigate damages. *Id.*

After filing the lis pendens, Anne contacted the Farm Service Bureau and had herself listed as a co-owner of certain property allotted to Win by the Agreement. The owner of that property was eligible for crop subsidies from the Bureau. Anne demanded Win pay her one/third of the subsidy or else she would refuse to sign the necessary documents and the subsidy would be lost. Win complied, but when he forwarded the documents to Anne, she increased her demand to two/thirds of the subsidy. Ultimately, Win did not complete the transaction because only farmers could receive the subsidy and Anne was not a farmer. Anne contends Win should have somehow collected the subsidies and placed them in escrow until her litigation was resolved. Her contention exceeds that which is necessary to mitigate damages. Accordingly, the master did not err in finding Win had not failed to mitigate his damages.

### C. Master's Jurisdiction Over the Second Hearing

Anne argues the master lacked subject matter jurisdiction to conduct the second hearing to determine Bo's contract damages because the order from the first hearing had been appealed. We disagree.

After the first hearing of the bifurcated proceeding, the master entered an order which found the Agreement to be valid and ordered its specific performance. The order also disposed of all issues concerning Win and dismissed him from the litigation. Anne appealed this first order. This Court, by order dated December 12, 1997, determined that "the appealed [first] order ends the dispute over some of the property . . .

[and] affects a substantial right involving the merits ... therefore, [it is] immediately appealable." However, "[i]n light of the pending [second hearing] and likelihood of a future appeal ... the parties' interests will best be served by holding the current appeal in abeyance until the master enters his [second] order...." Accordingly, the second hearing was held and this appeal of both orders followed. We find no error in this procedure as a consolidated appeal of both orders served the interests of judicial economy without prejudicing any of the parties.

### D. Bo's Lost Business Opportunity

Anne argues the master erred in awarding Bo $30,000 for a lost business opportunity. We agree.

■ An injured party may recover lost profits for a failed new business or enterprise if the lost profits are: (1) the natural consequence of the breach, (2) foreseeable by the breaching party, and (3) determinable with reasonable certainty. *Drews Co. v. Ledwith–Wolfe Assocs.*, 296 S.C. 207, 371 S.E.2d 532 (1988); *Beck v. Clarkson*, 300 S.C. 293, 387 S.E.2d 681 (Ct.App.1989). The evidence in the record fails to satisfy the necessary elements for this cause of action. First, there is little evidence that Bo lost a business opportunity as the natural consequence of the breach. Secondly, there is no evidence that Anne knew Bo was pursuing a business opportunity or that her breach of the Agreement would cause him to lose that opportunity. Finally, the value of the lost opportunity cannot be ascertained with reasonable certainty from the evidence presented to the master.

■ Bo testified he sought an equity line of credit of "at least" $30,000 on his residence so that he could become an investor in an existing appliance business in Denmark, South Carolina. The lis pendens Anne filed against Bo's residence prevented him from receiving the credit line so he missed this opportunity to invest. However, the record is silent as to the exact cost of Bo's investment or its projected return other than Bo's tentative $30,000 estimate. Bo did testify his investment would entitle him to a job at the store, but admitted no salary had been agreed upon. Additionally, Bo testified he consulted an accounting firm about the investment, but there

is no evidence in the record as to the result of that consultation other than Bo's own inconclusive testimony. Such evidence does not rise to the level of "reasonable certainty" as required by *Drews*. Accordingly, the master's award of $30,000 is reversed.

### IV. *Attorneys' Fees*

In a partition action, the trial court may assess attorney fees against any or all the parties-in-interest as equity demands. S.C.Code Ann. § 15–61–110 (1976). The amount of the award is within the discretion of the trial court and will not be disturbed on appeal absent a showing of an abuse of discretion. *Briggs v. Jackson*, 275 S.C. 523, 273 S.E.2d 532 (1981); *S & W Corp. v. Wells*, 283 S.C. 218, 321 S.E.2d 183 (Ct.App.1984).

Anne argues the master abused his discretion by ordering her to pay Win's and Bo's attorney fees because she had a legitimate reason for bringing the partition action. We disagree.

The master held that Anne abused the partition process and failed to effect the partition she sought. The record adequately supports the master's conclusion. Shortly after the formation of Shecut Investments, Anne and Bo began to quarrel over its operation. Anne then attempted to involve Win in these disputes and when he refused, she breached the Agreement and placed a lis pendens on property allotted solely to her brothers by the Agreement. Accordingly, we find no abuse of discretion in the master's award of attorney fees to Bo and Win.

Anne also argues the master erred in not granting all of her attorney fees from the sale of the beach property. This contention is not preserved for review. The appellant has the obligation to provide this Court with a sufficient record to reach a decision. *Medlock v. One 1985 Jeep Cherokee*, 322 S.C. 127, 470 S.E.2d 373 (1996); *State v. Tyndall*, 336 S.C. 8, 518 S.E.2d 278 (Ct.App.1999). Anne has not produced an itemization of her attorney fees and expenditures to enable us to determine if the master's award is reasonable. Accordingly, the award of attorney fees is affirmed.

## V. *Accounting*

■ An accounting action lies in equity. *Wolf v. Hayes,* 161 S.C. 293, 159 S.E. 620 (1931); *Ackerman v. Heard,* 287 S.C. 626, 340 S.E.2d 560 (Ct.App.1986). Accordingly, we may find facts in accordance with our own view of the preponderance of the evidence. *Townes Assoc., Ltd. v. City of Greenville,* 266 S.C. 81, 221 S.E.2d 773 (1976). However, we will not disregard the findings of the master who saw and heard the witnesses and was in a better position to judge their credibility. *Tiger, Inc. v. Fisher Agro, Inc.,* 301 S.C. 229, 391 S.E.2d 538 (1989).

### A. *Estate Income Accounting*

Anne argues the master erred in his accounting because she did not receive a third of all income produced by the estate. We disagree.

■ Anne's claim to a portion of the income generated by the estate before the Agreement was executed is not properly before this Court. The gravamen of this action involved the Agreement, so the master properly limited the accounting to income generated after the Agreement was executed. This limitation correctly acknowledged the jurisdiction of the probate court over the administration of Mrs. Shecut's estate before the Agreement was executed. *See* S.C.Code Ann. § 62–1–302 (Supp.1999). Accordingly, claims concerning pre-Agreement income must be raised to the probate court.

■ Anne's claim to income generated by property allotted to Win by the Agreement is without merit. She relinquished her claim to that property and its income in exchange for Win relinquishing his rights to the joint properties of Anne and Bo. Accordingly, the master correctly held Anne "had no interest in the property" allotted to Win by the Agreement or the income it generated after the execution of the Agreement.

■ Anne's claim to half the income generated by the joint property was adjudicated by the master. After an exhaustive accounting, the master ordered Bo to pay Anne $3,787.13 to equalize her share of the income generated by the joint property. Anne claims the master's award is inaccurate as Bo has received $112,670 from the joint property, but she has

received nothing. This assertion is not supported by the record. Her calculation of the income Bo allegedly received does not account for the expenses generated by that property or the withdrawals made by both parties. The record also contains ample evidence contradicting Anne's assertion that she has not received any income from the joint properties. She and Bo both took draws from their partnership account and split certain cash rental income. Additionally, Anne is entitled to a portion of rental income which she and Bo decided should be deposited into the estate attorney's escrow account after the operation of Shecut Investments ceased. We affirm the master's accounting and award of $3,787.13 to Anne. *See Duckett v. Payne*, 279 S.C. 94, 96, 302 S.E.2d 342, 343 (1983) ("[T]he appellant carries the burden of convincing this Court that the trial court erred.").

### B. *Bo's Use and Enjoyment of Joint Property*

Anne claims Bo must pay her rent for the use of their beach house and hog parlor. We disagree. As a joint-tenant, Bo is entitled to the use and enjoyment of jointly owned properties.

> In the absence of a statute requiring a different result, a cotenant who has enjoyed occupancy of the common premises ... is not liable to the others for rent, and is not accountable to them for the reasonable value of his or her occupancy, where they have not been ousted or excluded, nor their equal rights denied, and where no agreement to pay for occupancy, or limiting or assigning rights of occupancy, have been made.

20 Am.Jur.2d *Cotenancy and Joint Ownership* § 49 (1995). Anne offers no evidence of either ouster or exclusion. Accordingly, Bo does not owe Anne anything for his use of the beach house and hog parlor. *See Duckett*, 279 S.C. 94, 96, 302 S.E.2d 342, 343.

### VI. *Master's Bias and Abuse of Discretion*

Finally, Anne argues the master's orders were the result of deliberate bias and an abuse of discretion. Because Anne never requested the master recuse himself, this issue is not preserved. *McGee v. Bruce Hosp. Sys.*, 321 S.C. 340, 468

S.E.2d 633 (1996) (issue must have been raised to the trial court to be preserved for appellate review).

■■■■ Even if this issue was preserved, it is without merit. The Code of Judicial Conduct requires a judge to "disqualify himself in a proceeding in which his impartiality might reasonably be questioned." Canon 3(C)(1) of the Code of Judicial Conduct, Rule 501, SCACR. A judge must exercise sound judicial discretion in determining whether his impartiality might reasonably be questioned. *Christy v. Christy,* 317 S.C. 145, 452 S.E.2d 1 (Ct.App.1994). Absent evidence of judicial prejudice, a judge's failure to disqualify himself will not be reversed on appeal, *Ellis v. Procter & Gamble Dist. Co.,* 315 S.C. 283, 433 S.E.2d 856 (1993). It is not enough for a party seeking disqualification to simply allege bias. The party must show some evidence of bias. *Christensen v. Mikell,* 324 S.C. 70, 476 S.E.2d 692 (1996); *Mallett v. Mallett,* 323 S.C. 141, 473 S.E.2d 804 (Ct.App.1996). Furthermore, the alleged bias must be personal, as distinguished from judicial, in nature. *Christensen v. Mikell,* 324 S.C. 70, 476 S.E.2d 692 (1996). Here, Anne argues the master's alleged legal errors in this case resulted from his bias and animus against her. However, the record does not contain any evidence of judicial prejudice or personal bias to support Anne's contention.

### Conclusion

The master was correct in upholding the private Agreement of the parties and ordering its specific performance. As to Anne's claim for an accounting, the master's order properly disposes of it. The master's award of lost timber profits to Win is not supported by the record. Likewise, the master's award for a lost business opportunity to Bo is unsupported by the evidence. We find support and affirm the award of attorney fees by the master. Anne failed to raise the issue of bias of the master at the trial level and we find no error in the master not recusing himself. However, we hold that Anne's interest in the pond has not been protected by the master and remand that issue for reconsideration.

Accordingly, the orders of the master are

498

**AFFIRMED IN PART, REVERSED IN PART AND RE-MANDED IN PART.**

HEARN, C.J., CURETON and HOWARD, JJ., concur.